[Nos. D020002, D021351. Fourth Dist., Div. One. Mar. 15, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY LEE WILDER, Defendant and Appellant.

[No. D021351. Fourth Dist., Div. One. Mar. 15, 1995.]

In re GARY LEE WILDER on Habeas Corpus.

**[Opinion certified for partial publication.[1]]**

_____

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts IV.-VII.

**COUNSEL**

Robert F. Howell, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B. Davis and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FROEHLICH, J.**—In this opinion we decide the constitutionality of Penal Code section 1026.5, subdivision (b),[2] which sets out the procedures for extending the commitment to the state Department of Mental Health of a person found not guilty of a felony by reason of insanity.

Appellant Gary Lee Wilder (Wilder) contends he was denied due process at a trial under section 1026.5, subdivision (b), which resulted in an extension of his commitment. He argues section 1026.5, subdivision (b) is unconstitutional on its face and as applied, because extension of commitment under section 1026.5, subdivision (b) is based not on a finding of continued legal insanity under the *M'Naghten* test but on a standard which is unconstitutionally vague and overly inclusive. He also asserts (1) the trial court prejudicially erred by failing to instruct sua sponte on the legal meaning of

---

[2]All statutory references are to the Penal Code unless otherwise specified.

the phrase "mental disease, defect or disorder"; (2) he was denied equal protection by the application of section 1026.5, subdivision (b); (3) the prosecution's use of evidence at the recommitment hearing was fundamentally unfair, depriving him of due process; (4) his attorney provided ineffective assistance because she stipulated to the admission of irrelevant and prejudicial hearsay and failed to object to inadmissible evidence; (5) the trial court failed to conduct meaningful inquiry into his motion to substitute counsel and abused its discretion in denying his motion; and (6) he was denied due process by the court's instruction on the preponderance of the evidence standard of proof.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

Wilder pleaded nolo contendere and not guilty by reason of insanity to one count of residential burglary.[4] The trial court found him not guilty by reason of insanity and committed him to the Department of Mental Health, placing him at Patton State Hospital (Patton) under section 1026.

On August 26, 1993, the district attorney petitioned under section 1026.5 to extend Wilder's commitment for two years on the basis that Wilder "is still suffering from a mental disease, defect, or disorder and by reason of such . . . presents a substantial danger, of physical harm to others."

At a jury trial on the petition, expert evidence was presented concerning Wilder's mental disease and danger to others. Wilder presented a defense that when medicated he posed no danger, and he would continue to take necessary medication when released.

Psychiatrist William Hocter (Hocter) interviewed Wilder and reviewed his history. Hocter opined that at the time of the interview Wilder had a bipolar disorder, also called manic-depressive illness, and that he presented a substantial danger to others. He also determined that Wilder had an antisocial personality disorder, which increased the severity and danger of his mental

---

[3]The issues numbered (3) through (6) in this paragraph are discussed in the nonpublished parts of this opinion.

[4]The charge related to an incident in March 1987 in which Wilder broke into a house and pointed a handgun at a man, who ran out of the house and called police.

Later that day Wilder broke into the home of a 47-year-old woman and her 78-year-old mother, forced them to listen to him talk about various subjects and had the younger woman write down his paraphrasing of parts of the Bible. During the encounter he also put out a cigarette on the younger woman's arm, had her remove her clothing, pinched her nipple, and handed her a gun, telling her to shoot him in the head.

Charges relating to the second incident were dismissed as part of a plea bargain. A statement relating the two incidents was read to the jury during voir dire. The propriety of the reading of the statement is discussed in part an unpublished portion of this opinion.

disease, and that Wilder abused alcohol, exacerbating the risks. Hocter stated that Wilder had just recently begun to gain insight into his mental illness and that he was uncertain whether Wilder would continue to take medication if he were not supervised.

Clinical psychologist Richard Owen (Owen) conducted a battery of psychological tests on Wilder and reviewed earlier psychological and psychiatric evaluations. Owen concluded Wilder suffered from residual chronic schizophrenia, an antisocial personality disorder, and substance abuse, the latter of which was in remission. Owen detailed earlier Patton reports on Wilder. He opined that if Wilder were released he would not take his medication and that he posed a risk of danger even on medication.

Clinical psychologist Thomas MacSpieden (MacSpieden) took Wilder's history, and administered an intelligence test and psychological tests. MacSpieden opined that Wilder suffered from manic-depressive illness and posed a risk of harm to others. He stated that Wilder had recounted to him a history of violence, which began when he was in the fourth grade, and that this pattern had increased through his life. MacSpieden said Wilder told him of crimes he had committed: a "robbery spree" when he was 18 and a gun battle and kidnapping of an Alabama state trooper. MacSpieden reported that Wilder appeared to glory in the telling of these events. MacSpieden said testing indicated that Wilder has a neurological dysfunction and Wilder told him of being knocked unconscious in a fall from a speeding automobile at the age of eight. MacSpieden further stated if Wilder were released into an unstructured setting, especially if he were not taking his medication or was drinking alcohol, he would pose a significant danger.

Patton staff psychiatrist Boniface Dy (Dy) met with Wilder at least once a month from July 1992 through February 1993. Dy first diagnosed Wilder as suffering from manic-depressive disorder because of his pressured speech, inflated self-esteem, hyperactivity, and distractibility. Wilder later seemed to improve and Dy changed the diagnosis to cyclothymic disorder—a less serious version of the disease. In late December 1992 Dy, with Wilder's permission, began withdrawing Wilder's lithium treatment to gauge his condition without medication. However, the experiment was unsuccessful and, after he threatened other individuals, Wilder had to be placed in seclusion and put into restraints. Dy resumed the lithium treatment in February 1993, but noted that although Wilder's condition improved, he continued to be hostile and uncooperative. Dy opined that Wilder presented a danger to others and that it would be difficult for Wilder to continue to improve outside of a structured environment.

Patton psychiatric social worker Dixie Lowder (Lowder) worked in the unit in which Wilder was housed from July 1992 until February 1993.

Lowder noted that Wilder was a particularly needy and difficult patient and that he resisted treatment programs offered, but requested individualized psychotherapy, which the staff decided would have negative results. Lowder opined that Wilder suffered from bipolar disorder and antisocial personality. She stated that he posed a risk of danger to others and that few people with Wilder's problems will take medication in an unstructured environment.

Patton psychiatric social worker Mary Fleming (Fleming) worked in Wilder's unit for several months in 1991 and was his individual therapist from April 1993 until September 1993. She stated Wilder's current diagnosis was bipolar disorder, alcohol abuse and antisocial personality. She opined that Wilder appeared to be making a sincere attempt to participate in therapy, that he was always polite, and that he had not been involved in any altercations or physical violence. Fleming opined that Wilder's recent period of therapy was insufficient, recommending instead a period of at least two years. She also said Wilder needed to work further on his alcohol problem. Additionally, she stated that many people with Wilder's problems do not continue to take medication in an unstructured setting.

Patton registered nurse Vanna Anderson cared for Wilder after his recent heart attack and observed that he appeared more subdued than at previous times. She stated Wilder's potential for danger to others would depend on whether he continued to take his medication and stayed away from alcohol. She said she believed him when he told her he would take medication when released.

*Witnesses for Wilder*

Patton psychiatric technician Robert Smith (Smith) provided primary care for Wilder at Patton from 1988 to 1990 and again in 1992. Smith said Wilder was arrogant and nasty when he first worked with him, but later Wilder became more accepting. Smith attributed the change to Wilder's giving up drinking after completing an alcohol dependency program. Smith also said Wilder appeared to be less agitated since suffering a recent heart attack.

Wilder, testifying in his own behalf, said that he had conducted himself as an ex-convict when he first arrived at Patton, but that later he did research and developed insight into his problems. He said in December 1992 he agreed to stop taking lithium to determine if he had a mental illness which required medication, and he had learned from that experience that he needed to take lithium for the rest of his life. He also said he knew he could not drink alcohol in combination with the medication. Wilder said he remembers only parts of the circumstances of the crimes of which he was accused. He

also testified that he had stopped making, drinking and supplying bootleg alcohol after completing the alcohol abuse program at Patton.

DISCUSSION

I. *Due Process*

 Wilder contends section 1026.5 is unconstitutional on its face and as applied to his case. He argues the order for extension of commitment violates his due process rights because it is not based on the same standard under which he was committed.

Under the California procedure for commitment of insanity acquittees, if a defendant is judged not guilty of a felony because of legal insanity, he may be committed to the Department of Mental Health for a period of time which does not exceed the maximum state prison term to which he could have been sentenced for the underlying offense. (§§ 1026, 1026.5, subd. (a)(1).) Section 1026.2 provides that a defendant must be released when his sanity is restored. Section 1026.5, subdivision (a)(1) requires his release when the maximum period has expired. At the end of the maximum time period, however, the district attorney may petition to extend the commitment if the patient presents a substantial risk of physical harm to others because of a mental disease, defect or disorder. (§ 1026.5, subd. (b)(1).)[5] The patient is entitled to a jury trial on the petition (§ 1026.5, subd.(b)(3)), and section 1026.5, subdivision (b)(8) limits each extension of commitment to a two-year period. In order for the confinement to be extended, the prosecution must show beyond a reasonable doubt that the patient is mentally ill and a physical danger to others. (*People* v. *Buttes* (1982) 134 Cal.App.3d 116, 125 [184 Cal.Rptr. 497].)

The test for legal insanity in California is codified in section 25, subdivision (b), which provides in pertinent part: "In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."

This test is based on the *M'Naghten* standard adopted by the House of Lords in *M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722-723. (*People* v.

---

[5]Section 1026.5, subdivision (b)(1) states in pertinent part: "A person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others."

*Kelly* (1992) 1 Cal.4th 495, 532 [3 Cal.Rptr.2d 677, 822 P.2d 385].) For over a century prior to 1978 California based its standard of legal insanity on the *M'Naghten* test. (*Ibid.*) In 1978, however, in *People* v. *Drew* (1978) 22 Cal.3d 333, 345 [149 Cal.Rptr. 275, 583 P.2d 1318], our Supreme Court abandoned the *M'Naghten* test and substituted an alternative standard for insanity proposed by the American Law Institute: " 'A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.' " (*Id.* at p. 345.)

In June 1982 the California electorate rejected this standard and passed an initiative measure, which included among its provisions the reintroduction of the *M'Naghten* definition as the standard for legal insanity. In the ballot pamphlet prepared for the voters concerning this and other initiative measures, the legislative analyst stated that provisions in the new statute could increase the difficulty of proving that a person is not guilty by reason of insanity. (Ballot Pamp., Criminal Justice—Legislative Statutes and Const. Amend., Analysis by the Legis. Analyst, Prim. Elec. (June 8, 1982) p. 55.)

Thus, we assume that the electorate in passing this initiative intentionally erected a difficult barrier for the criminal defendant to prove legal insanity. The barrier was put into place in order that those individuals who should be held criminally responsible for their crimes do not avoid punishment, and only criminal defendants who truly are legally insane are committed to mental hospitals where they may receive treatment. The standard for legal insanity is specifically designed for, and applicable only as, a defense to criminal charges.

■ By contrast, proceedings to extend the commitment of a patient under section 1026.5, subdivision (b), though they include many constitutional protections relating to criminal proceedings, are essentially civil in nature. (*People* v. *Superior Court* (*Williams*) (1991) 233 Cal.App.3d 477, 485, 488 [284 Cal.Rptr. 601].) At a hearing under section 1026.5, subdivision (b) the trier of fact is not concerned with the patient's avoidance of criminal responsibility, but only with treatment for his mental illness. "An individual subject to recommitment proceedings 'is not threatened with penal treatment. He has had his criminal trial and been adjudicated not guilty by reason of insanity. The only remaining issue is how long he must remain committed to a state hospital for treatment.' " (*People* v. *Superior Court* (*Williams*), *supra*, at p. 485, quoting *Juarez* v. *Superior Court* (1987) 196 Cal.App.3d 928, 932 [242 Cal.Rptr. 192].)

At an extension of commitment hearing, the insanity acquittee is like an individual who has been committed in civil proceedings—that is, a "person [who] as a result of mental disorder, is a danger to others, or to himself or herself, or [is] gravely disabled." (Welf. & Inst. Code, § 5150.) The standard to extend commitment—that the insanity acquittee present a risk of harm because of mental disease, defect or disorder—is designed to ensure that the patient will continue to receive treatment and that society will be protected. Due process does not require that the standard for legal insanity and the standard for extension of commitment for an insanity acquittee be identical.

Wilder's reliance on *Foucha* v. *Louisiana* (1992) 504 U.S. 71 [118 L.Ed.2d 437, 112 S.Ct. 1780] is misplaced. In *Foucha* the United States Supreme Court considered Louisiana's procedures allowing recommitment of insanity acquittees. Under Louisiana law a defendant who was found not guilty because of insanity was committed to a psychiatric hospital. If he sought release, he was required to prove that he was not dangerous. In the absence of such proof he was returned to the hospital whether or not he was mentally ill. (118 L.Ed.2d at pp. 443-444, 112 S.Ct. at pp. 1781-1782.)

The Supreme Court held that this process violated due process. The court stated: "'the Constitution permits the Government, on the basis of the insanity judgment, to confine [an insanity acquittee] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society.'" (*Foucha* v. *Louisiana, supra,* 504 U.S. at pp. 77-78 [118 L.Ed.2d at p. 446, 112 S.Ct. at p. 1784], quoting *Jones* v. *United States* (1983) 463 U.S 354, 370 [77 L.Ed.2d 694, 709, 103 S.Ct. 3043].) The court ruled that Louisiana could not continue to hold an insanity acquittee on the basis of his dangerousness alone. Because the petitioner in *Foucha* had been found to be no longer mentally ill, he could not be held as a mentally ill person, and if his confinement were to be continued he had to be afforded constitutionally adequate procedures to establish grounds for his confinement. (*Foucha, supra,* 504 U.S. at pp. 77-78 [118 L.Ed.2d at pp. 446-447, 112 S.Ct. at p. 1784].)

California's procedures, by contrast, comply with due process. They require that in order to extend a commitment the government must show beyond a reasonable doubt that the committed person poses a substantial danger of physical harm to others by reason of a mental disease, defect or disorder. The *Foucha* opinion provides no support for Wilder's argument that section 1026.5 is unconstitutional because under its terms recommitment is based on a standard different from that which would be required to find a person not guilty by reason of insanity.

"Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." (*Foucha, supra,* 504 U.S. at p. 79 [118 L.Ed.2d at p. 447, 112 S.Ct. at p. 1785].) Extended commitment thus must bear a reasonable relation to the purpose for that commitment.

The purpose of committing an insanity acquittee is two-fold: to treat his mental illness and to protect him and society from his potential dangerousness. (*Jones* v. *United States, supra,* 463 U.S. at p. 368 [77 L.Ed.2d at pp. 707-708].) If the acquittee continues to be mentally ill and dangerous at the end of the maximum commitment period, the government may petition to extend the commitment for the same twofold purpose: to treat the mentally ill person and to protect society. By requiring the prosecution to prove dangerousness because of mental disease, defect, or disorder, section 1026.5, subdivision (b) assures that the extended commitment bears a reasonable relation to the purpose of commitment.[6]

 Wilder also argues that the phrase "mental disease, defect or disorder" fails to satisfy due process requirements because the terms are over-inclusive and vague. He argues application of section 1026.5, subdivision (b)(1) eviscerates the distinction between persons who are mentally ill and persons who are perfectly sane, but are recidivists or sociopaths.

The phrase "mental disease, defect or disorder" does not encompass the mental conditions of recidivists or sociopaths. The terms refer only to the mentally ill. In the *Foucha* case the petitioner did not qualify as having a mental illness because he was diagnosed as having only "an antisocial personality, a condition that is not a mental disease and that is untreatable." (*Foucha* v. *Louisiana, supra,* 504 U.S. at p. 75 [118 L.Ed.2d at p. 445, 112 S.Ct. at p. 1782].)[7] Wilder, on the other hand, did not have merely an antisocial personality disorder; numerous witnesses from the mental health

---

[6]In a similar circumstance a District of Columbia appellate court, in *Jackson* v. *U.S.* (D.C.App. 1994) 641 A.2d 454, rejected an appellant's argument that the standard for releasing an insanity acquittee must parallel the standard for acquitting the accused by reason of insanity. The court noted the purpose of committing an insanity acquittee is to treat his mental illness and protect him and society from potential danger. Such purpose is not limited to preventing future criminal conduct caused by the mental illness which justified his acquittal. The court ruled that due process requires only that continued commitment be reasonably related to the purpose of the original commitment. The same standard of insanity is not required, because there is a reasonable relation between the purpose of the original and the extended commitment, each being twofold: treatment for the acquittee and protection of society. (*Id.* at pp. 456-457.)

[7]The court in *People* v. *Superior Court (Williams), supra,* 233 Cal.App.3d at page 490, noted that according to the Diagnostic and Statistical Manual, on which psychiatrists rely, antisocial personality is a mental disorder identified by criteria other than repeated criminal

field testified that he suffered from mental illness. Psychiatrists Hocter and Dy, psychologist MacSpieden, and social workers Lowder and Fleming all agreed that he suffered from bipolar disorder or cyclothymia in addition to having an antisocial personality. Psychologist Owen testified that Wilder suffered from residual chronic schizophrenia and an antisocial personality. Each witness opined that Wilder's illness caused him to be dangerous. The fact that the deputy district attorney's declaration stated that Wilder's mental disease, defect or disorder included cyclothymia, alcohol abuse and antisocial personality does not render the terms of the statute impermissibly vague. The terms refer to conditions of mental illness, not to characteristics of sociopaths and recidivists. Extension of Wilder's commitment on the basis that he posed a danger due to mental disease, defect, or disorder as well as dangerousness, is in accord with due process requirements.[8]

## II. Instruction on the Meaning of "Mental Disease, Defect or Disorder"

■ Wilder contends he was denied his Fourteenth Amendment right to due process and his Sixth Amendment right to a jury trial because the trial court failed to instruct sua sponte on the meaning of "mental disease, defect or disorder."

■ " ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311], quoting *People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) In the absence of a

---

and antisocial behavior, including anger, unstable moods, impulsiveness, lack of remorse, inability to empathize with others, and limited frustration tolerance.

[8]Although we have found no California case which has construed *Foucha* with California law, we note that in *U.S.* v. *Jackson* (5th Cir. 1994) 19 F.3d 1003, 1008, the court rejected the appellant's attempted reliance on *Foucha*, holding that he had failed to show that his dangerousness was not related to his mental illness. The court in *Levine* v. *Torvik* (6th Cir. 1993) 986 F.2d 1506, 1512, held that Ohio law allowing extended commitment for a dangerous and mentally ill person complies with the constitutional standard. In *People* v. *Parrish* (Colo.App. 1994) 879 P.2d 453, the court held that Colorado law, which requires findings of both an abnormal mental condition and dangerousness in order to extend commitment, complies with *Foucha* (*id.* at p. 456), and that in *Parrish* there was ample reason beyond the diagnosis of antisocial personality disorder to support continuing confinement. (*Id.* at p. 457.) The court also determined that use of the term "abnormal mental condition" did not invalidate the Colorado statute because, for purposes of the statute, Colorado law considers abnormal mental condition to be equivalent to mental disease or defect. (*Id.* at p. 456.) The court noted that the *Foucha* Court did not define the term "mental illness" or use it as a term of art in either a legal or psychiatric sense. (*Id.* at pp. 456-457.)

request, however, the trial court is not obligated to further explain an instruction. (*People* v. *Kimble* (1988) 44 Cal.3d 480, 503 [244 Cal.Rptr. 148, 749 P.2d 803].)

Wilder did not request a definition of the terms. Moreover, no further explanation was necessary to enable the jury to decide the issues in the case.

The court instructed with CALJIC No. 4.17 (Proceedings to Extend Commitment) as follows: "In this case, the question for your determination is whether the respondent, Gary Lee Wilder, by reason of a mental disease, defect or disorder, represents a substantial danger of physical harm to others. The state has the burden of proving beyond a reasonable doubt that the respondent, one, has a mental disease, defect or disorder, and two, by reason of that mental condition, represents a substantial danger of physical harm to others."

The district attorney stated to the jury that Wilder suffered from a mental disease, defect or disorder. He stated that the witnesses had all testified that Wilder continued to suffer from a mental disease, defect or disorder—that is, bipolar disorder and antisocial personality disorder. He argued:

"We heard from Dr. Hocter. We heard from Dr. MacSpieden. We heard from Dr. Owen. We heard from Ms. Lowder yesterday. We heard from Ms. Fleming, his current therapist, the woman he sees currently as his therapist.

"What do they all tell us? What they all tell us is that he still continues to suffer from this mental disease, disorder or defect or mental condition. What is it? It seems to be something to do with manic-depressive problems.

"At one point last year, I think Dr. Dy thought he would downgrade that to a cyclothymic disorder, which he described as being a less serious version of the manic-depressive bipolar disorder, but he still suffered from it and [it] still enforced the way he thought and the way he reacted.

"He also had what we call—all of them, every single one of them called antisocial personality disorder, which talks about not being able to restrain—it's a thought process disorder, not being able to restrain oneself. He's still working on that.

"There is some indication from Dr. Owen that there might be schizophrenic thought disorder. And certainly he said the manic bipolar disorder and the antisocial personality disorder and the schizophrenia are kind of

overlapping. And they are all of the opinion, unanimously of the opinion, he is still suffering from mental disease, disorder, defect, a mental condition, and as a result of that, there is a danger."

As the district attorney argued, all of these witnesses testified that Wilder suffered from a mental condition which constituted a mental disease, defect or disorder (i.e., bipolar disorder or schizophrenia) as well as an antisocial personality. Wilder did not disagree with these opinions but presented the defense that because of his use of lithium he no longer posed a danger. The meaning of the phrase "mental disease, defect or disorder" was sufficiently explained in testimony and argument to allow an adequate understanding by the jury. No further explanation was required in the absence of a request.

## III. *Equal Protection*

 Wilder next asserts the recommitment procedures under section 1026.5, subdivision (b) deprived him of his right to equal protection because (1) at a recommitment hearing under section 1026.5, subdivision (b), evidence may be considered from any time in the individual's life, while at civil commitment hearings evidence of events which occurred only during the past six years may be introduced (Welf. & Inst. Code, § 5300.5, subd. (c)); and (2) under section 1026.5, subdivision (b), the maximum period of recommitment is two years, while at civil hearings commitment is limited to one hundred eighty-day periods (Welf. & Inst. Code, § 5300).

 "Under the equal protection clause, '[a] classification "must be reasonable, not arbitrary, and must rest upon some grounds of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." ' " (*In re Vanessa W.* (1993) 17 Cal.App.4th 800, 806 [21 Cal.Rptr.2d 633], quoting *Reed* v. *Reed* (1971) 404 U.S. 71, 76 [30 L.Ed.2d 225, 229-230, 92 S.Ct. 251].) In the absence of a suspect classification or an intrusion on a fundamental right, the challenged classification must bear a reasonable relationship to a legitimate state purpose. (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 40 [36 L.Ed.2d 16, 47, 93 S.Ct. 1278].) Insanity acquittees do not constitute a suspect classification. They themselves have raised the issue of their legal insanity as a defense in criminal proceedings. Moreover, recommitment procedures do not concern a fundamental right. Although commitment to a mental institution involves a significant loss of liberty (*Addington* v. *Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 330-331, 99 S.Ct. 1804]), a person who is found not guilty of a crime by reason of insanity does not have a fundamental right to unrestricted liberty.

Civilly committed individuals and insanity acquittees are not similarly situated. Civil commitment is intended for those persons who present a

danger to themselves or others because of a mental disorder or who are gravely disabled. (Welf. & Inst. Code, § 5150.) By contrast, an insanity acquittee has demonstrated dangerousness by committing a criminal offense. The acquittee has raised his mental illness as a defense to his criminal conduct and there has been an adjudication that he committed a criminal act and was legally insane when he did so.

As the United States Supreme Court stated in *Jones* v. *United States*, *supra*, 463 U.S. at page 367 [77 L.Ed.2d at page 707], "[t]he *Addington* Court expressed particular concern that members of the public could be confined on the basis of 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. [*Addington* v. *Texas, supra,*] 441 U.S. at 426-427. . . . But since [commitment as an insanity acquittee] follows only if the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is good reason for diminished concern as to the risk of error. More important, the proof that he committed a criminal act as a result of his mental illness eliminates the risk that he is being committed for mere 'idiosyncratic behavior,' [Citation]." (Italics in original, fns. omitted.)

Our Supreme Court discussed differences in criminal and civil commitment procedures with regard to the right to jury trials in *People* v. *Tilbury* (1991) 54 Cal.3d 56 [284 Cal.Rptr. 288, 813 P.2d 1318], stating: "[D]ifferences in criminal and civil commitment procedures need only be justified by a rational basis. [Citations.] Such differences reflect 'the widely and reasonably held view that insanity acquittees constitute a special class that should be treated differently from other candidates for commitment.' [Citation.] The rational basis for California's different treatment of insanity acquittees is that such a person initiates the commitment process himself by pleading and proving that mental illness has led him to commit a crime. These circumstances substantially reduce the risk of erroneous commitment, or commitment for harmless, abnormal behavior, that justifies the need for frequent recommitment hearings in the civil context." (*Id.* at p. 68.)

As observed by the court in *Tilbury*, the risk of error is reduced in a criminal commitment because (1) the insanity acquittee himself placed his mental health at issue by pleading not guilty by reason of insanity and by proving legal insanity at trial; and (2) the acquittee demonstrated his dangerousness by committing a criminal offense. There is a rational basis for differences in criminal and civil commitment procedures.

IV.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order is affirmed. The petition for a writ of habeas corpus is denied.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied April 5, 1995, and appellant's petition for review by the Supreme Court was denied June 14, 1995.

.

---

*See footnote 1, *ante*, page 90.