[No. C032561. Third Dist. July 30, 2001.]

PLACER RANCH PARTNERS et al., Plaintiffs and Appellants, v.
COUNTY OF PLACER, Defendant and Respondent.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, III and IV.

COUNSEL

Manatt, Phelps & Phillips, David Elson, Maria D. Hummer and Donna R. Black for Plaintiffs and Appellants.

Anthony La Bouff, County Counsel, Scott Finley, Deputy County Counsel; Morrison & Foerster, Michael H. Zischke, Steven L. Vettel; Landels Ripley & Diamond, Sanford Svetcov, Ted Stevens and Scott Sellwood for Defendant and Respondent.

OPINION

HULL, J.—In what is often perceived to be the typical case involving the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq. [further undesignated statutory references are to the Public Resources Code]), a zealous citizens group challenges the approval of a development project by asserting that a government entity failed to consider possible adverse environmental effects of the projects, or otherwise failed to follow mandated CEQA procedures. This is not that case. Here, it is the developers who invoke CEQA's protections to challenge the government agency's actions.

After receiving input on a draft environmental impact report (DEIR) for its general plan update, the Placer County Board of Supervisors (the County) opted to modify its plans and, instead of permitting the development of four new towns in rural portions of the county, decided to meet forecasted housing needs through the use of in-fill projects in existing towns. This option, which had been presented as an alternative in the DEIR, was incorporated into the final environmental impact report (FEIR).

Plaintiffs Placer Ranch Partners, Placer Ranch 160, and Stanford Ranch, Inc., developers for some of the proposed new towns, filed a petition for mandate, asserting various CEQA violations. Essentially, they argued that the County's decision to eliminate the new towns changed the project to such a degree that, instead of certifying the FEIR, the County should have prepared and recirculated a new EIR. Plaintiffs claimed the County's environmental review did not meet CEQA requirements, and they further argued the County acted arbitrarily in prohibiting residential development within one mile of the County's landfill.[1] The trial court rejected these claims and denied plaintiffs' petition.

On appeal, plaintiffs reiterate their assertions. We conclude the County's environmental analysis was appropriate to a general plan update. No recirculation was required. We further conclude substantial evidence supports the

---

[1] These claims were initially presented in two separate writ petitions that were consolidated.

County's decision to create a one-mile buffer area around its landfill. We therefore affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

In late 1990, the County began the process of updating its general plan. It embarked on this effort by taking a number of preliminary steps, such as holding town hall meetings to explain the update process and the upcoming opportunities for public participation. In October 1992, the County released a "Draft General Plan Background Report" that provided background information on the issues to be addressed in the general plan and described existing conditions and trends within Placer County.

The County worked with its consultants to prepare an "Issues and Options Report" that was designed to solicit policy direction from the County on key issues to be addressed in the general plan update. Essentially, this report served to focus the project. Various issues were discussed, including broadly defined choices for the pattern of future growth in Placer County. Census and assessor's data indicated the population of Placer County in 1990 was 170,452. That population was expected to grow to approximately 310,000 by 2010.

The Issues and Options Report was presented to the public in six town hall meetings in early 1993 and was the subject of seven public meetings of the County from February through July 1993.

The report analyzed three different land use alternatives for accommodating the development forecasted to occur through the year 2010. "Alternative 1" directed new urban growth to the cities, and emphasized shifting control of growth and development from the County to the cities. "Alternative 2" promoted new growth in established unincorporated areas near existing developed areas. Under this scenario, the County would retain the authority over development proposals. "Alternative 3" proposed a new growth area, redirecting growth from established unincorporated areas. This alternative would permit urban development in an entirely new location. The report assumed this "new town" would have a build-out population of approximately 20,000 in an area of approximately four square miles.

The County opted in favor of a modified version of Alternative 3, dubbed "Alternative 5," which proposed the creation of four new growth areas. Plaintiffs own land on which some of these developments were planned. Under the existing general plan, this land was zoned for agricultural and industrial uses. Alternative 5 rezoned this property for residential development.

A DEIR was prepared that described Alternative 5 and the various other land use proposals that had been considered. Appendix A to the DEIR, a summary of the Issues and Options Report, outlined the three original land use alternatives (urban in-fill, unincorporated in-fill, and new towns) and compared them on a variety of issues, such as jobs-housing balance, agricultural land conversion, air quality, traffic, infrastructure, and financial/fiscal matters.

When the DEIR was circulated for public comment, a great deal of controversy arose over the plan for four new towns. Existing cities, citizens groups, and individuals objected to this plan and expressed their strong preferences for directing growth to existing urban areas.

In response to these concerns, the County modified its proposed general plan update by abandoning the "new towns" concept and instead promoted Alternative 1, focusing new growth to existing towns. Under this proposal, plaintiffs' land would not be rezoned but would retain its agricultural/industrial zoning. The County also opted to impose a one-mile buffer around its landfill and preclude residential development within this area.

An FEIR was prepared reflecting these decisions. The County certified the FEIR, adopted findings, a statement of overriding considerations, and the general plan update.

Plaintiffs filed a petition for writ of mandate, asserting the County did not comply with CEQA requirements. They claimed that the project, as ultimately approved, was so different from the project described in the DEIR that the County should have recirculated an EIR. They challenged the incorporation of materials in the EIR, and raised a multitude of other assertions, including claims that the EIR did not adequately analyze impacts, alternatives or mitigation measures. They challenged the imposition of a one-mile buffer area around the landfill and further argued the EIR violated state mandates for affordable housing.

The trial court denied plaintiffs' petition, and this appeal followed.

DISCUSSION

I-IV*

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

*See footnote, *ante*, page 1336.

## V

### Landfill Buffer

■ In adopting the general plan update, the County imposed a one-mile buffer around its landfill, leaving that property zoned for agricultural and industrial use. Plaintiffs, who own this property and had hoped to develop it as part of a residential community, assert there was no evidence to support the buffer zone. We disagree.

■ Substantial evidence challenges under CEQA "are resolved much as substantial evidence claims in any other setting: a reviewing court will resolve reasonable doubts in favor of the administrative decision, and will not set aside an agency's determination on the ground that the opposite conclusion would have been equally, or more reasonable." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945-946 [91 Cal.Rptr.2d 66].)

■ "While local bodies retain broad discretion in zoning issues, their authority is not boundless. Zoning restrictions may be stricken if they are 'arbitrary and unreasonable and without substantial relation to public health, safety, or morals.' [Citation.] In other words, 'a land use restriction lies within the public power if it has a "reasonable relation to the public welfare." [Citations.]' [Citation.] ' "The courts may differ with the zoning authorities as to the 'necessity or propriety of an enactment,' but so long as it remains a 'question upon which reasonable minds might differ,' there will be no judicial interference with the municipality's determination of policy." [Citation.] . . . Setbacks and similar buffers are among the tools counties may use in the interest of sound community planning." (*Big Creek Lumber Co. v. County of San Mateo* (1995) 31 Cal.App.4th 418, 428-429 [37 Cal.Rptr.2d 159]; see also *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 159-160 [130 Cal.Rptr. 465, 550 P.2d 1001].)

■ Plaintiffs contend that, while a smaller buffer zone around the landfill may have been appropriate, no evidence supports the imposition of a one-mile buffer.

"The question, however, is not whether this court . . . is convinced [one mile] of buffer [is] 'necessary,' or whether [a] smaller zone[] would adequately accommodate the conflicting land uses. The legal issue is whether the propriety of the larger zone[] is a fairly debatable question, one upon which reasonable minds could differ." (*Big Creek Lumber Co. v. County of San Mateo, supra,* 31 Cal.App.4th at p. 429.)

As plaintiffs note, there was no scientific evidence presented that a one-mile buffer was necessary. In testifying before the County, witnesses from various governmental agencies and task forces testified that, while the selection of a one-mile buffer (versus a smaller buffer) was somewhat "arbitrary," there were reasons for that decision. The landfill was an important and valuable county asset, and was predicted to remain viable for years to come. If residential areas encroached on that space, its period of usefulness might be reduced, and siting a new landfill would be difficult. Landfills pose health and safety concerns, and can affect property values in the area. Residents from more than two miles away from the current landfill had complained of dust, odors, litter and traffic. The very real concerns raised by a landfill, as well as the public perceptions relating to a site, can prompt an outcry by area residents.

Witnesses explained that the size of buffers in other jurisdictions depended in part on the topography of the area and the site location. Some counties, with landfills in isolated areas, did not require any buffer area. Landfills that were not highly visible tended to be subject to smaller buffer areas.[8] The site here was flat, and the landfill could be seen from a distance.

None of the proposed buffer area was currently zoned for residential use, and the witnesses pointed out that other nonresidential uses would continue to be permitted within the proposed one-mile buffer zone.

Witnesses testifying for plaintiffs argued a 1,000- to 2,000-foot buffer zone would be adequate. They asserted there was no evidence that a one-mile buffer provided better protection, and pointed out that no other jurisdictions required such a large buffer between a landfill and residential areas.

As the recap of this evidence indicates, different witnesses had different opinions about the proper size of a landfill buffer zone. While no scientific evidence was introduced to support a one-mile buffer, other substantial and relevant evidence supports the County's decision. (See *Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 711 [38 Cal.Rptr.2d 413] [opinions of area residents are an appropriate factor to consider in making zoning decisions].) Given the need to preserve the landfill for future community use and the concerns expressed by residents as far as two miles from the site, the County acted properly in deciding to

---

[8]Plaintiffs criticize some of this testimony as vague, noting the speaker did not identify the names of people in other counties he had spoken to and had not ascertained whether they had sufficient knowledge to respond to his questions. However, the same can be said of the information presented by plaintiffs' experts: They did not identify how they obtained their information on other landfills, nor did they discuss the backgrounds of the people who provided that information.

maintain the existing zoning surrounding the landfill and to require a one-mile buffer between the landfill and any residential development. This restriction has a reasonable relation to the public welfare and is a valid exercise of the County's police powers.[9] (*Big Creek Lumber Co. v. County of San Mateo, supra,* 31 Cal.App.4th at pp. 429-430.)

### DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Callahan, J., concurred.

A petition for a rehearing was denied August 23, 2001, and appellants' petition for review by the Supreme Court was denied October 24, 2001.

---

[9]Contrary to rules of appellate procedure, plaintiffs raise a brief equal protection argument in a footnote. (Cal. Rules of Court, rule 15(a).) We will not consider this claim. (See *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4 [41 Cal.Rptr.2d 263].) Moreover, plaintiffs did not voice this concern to the County during the environmental review process, which precludes their claim here. (*Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1447-1448 [35 Cal.Rptr.2d 334].)