[No. C037863. Third Dist. Aug. 22, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN DOUGLAS CROSSWHITE, Defendant and Appellant.

## COUNSEL

Paul Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Patrick J. Whalen and Brian G. Smiley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, J.**—Defendant John Douglas Crosswhite appeals from an order extending his commitment to the state hospital pursuant to Penal Code section 1026.5,[1] which authorizes, under specified conditions, extended commitment of a person found not guilty of a felony by reason of insanity

---

[1] Undesignated statutory references are to the Penal Code.

Section 1026.5 provides in part: "(a)(1) In the case of any person committed to a state hospital or other treatment facility pursuant to Section 1026 or placed on outpatient status pursuant to Section 1604, who committed a felony on or after July 1, 1977, the court shall

(§ 1026), beyond the maximum term of commitment to which the person could have been sentenced for the underlying offense. Defendant contends section 1026.5, subdivision (b)(8) violates his due process and equal protection rights by excluding time spent on outpatient status from the maximum term of commitment. We shall conclude section 1026.5, subdivision (b)(8) does not violate due process or equal protection. We shall also reject defendant's alternative argument that there was insufficient evidence that he continued to pose a substantial danger of physical harm to others so as to support his extended commitment. We shall accordingly affirm the judgment (order).

### BACKGROUND

On September 2, 1980, defendant was charged with assault with intent to commit murder (former § 217) and assault with a deadly weapon on a peace officer by means likely to produce great bodily injury (§ 245, subd. (b)) and was accused of personally using a firearm during the commission of those offenses within the meaning of section 12022.5. Defendant entered a guilty plea to the assault on a peace officer charge and admitted the firearm enhancement, and the remaining charges were dismissed. The plea was entered with the understanding that the court would consider medical reports and determine if he was not guilty by reason of insanity.

On October 15, 1980, the trial court found defendant not guilty by reason of insanity pursuant to section 1026. Defendant was diagnosed with chronic paranoid schizophrenia and committed to Napa State Hospital for a maximum term of seven years.

On April 27, 1987, defendant agreed to have his term of commitment extended for two years pursuant to section 1026.5 and the court ordered he be released as an outpatient.

On February 11, 1988, the State Department of Mental Health (Department) notified the court that defendant had been returned to Napa State Hospital after attempting suicide and requested revocation of his outpatient

state in the commitment order the maximum term of commitment, and the person may not be kept in actual custody longer than the maximum term of commitment, except as provided in this section. For purposes of this section, 'maximum term of commitment' shall mean the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted . . . . [¶] . . . [¶]

"(b)(1) A person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others."

status. On April 21, 1988, the Department sought permission to withdraw the revocation request and requested defendant be sent to the Conditional Release Program (CONREP). On April 27, 1988, the court granted the Department's request.

On May 17, 1988, CONREP submitted an annual report to the court and recommended that defendant's outpatient status be extended for one year.[2] Defendant agreed to the extension request and the court granted the request on May 27, 1988.

On April 3, 1989, CONREP notified the court that defendant had been hospitalized for stabilization and requested revocation of his outpatient status. Defendant waived time for the revocation hearing to allow time for treatment and, on May 22, 1989, he was released back to CONREP as an outpatient.

On June 1, 1989, CONREP submitted an annual report to the court and recommended that defendant's outpatient status be extended for another year. Defendant agreed to the extension, and the court granted the request on July 7, 1989.

On May 24, 1990, CONREP submitted an annual report to the court and recommended that defendant's outpatient status be extended for another year. On June 22, 1990, defendant requested a finding that his sanity had been restored. On November 14, 1990, a jury found that defendant's sanity had not been restored and the court ordered defendant's outpatient status extended another year.

On May 24, 1991, CONREP submitted an annual report to the court and recommended that defendant's outpatient status be extended for another year. Defendant contested the extension and requested a bench trial. After the October 31, 1991, trial, the court found the People would be best served by extending defendant's outpatient status for another year.

On May 15, 1992, CONREP submitted an annual report to the court and recommended that defendant's outpatient status be extended for another year. Defendant contested the extension and requested a bench trial. Defendant also requested a finding that his sanity had been restored. The court

---

[2]Section 1606 (which addresses outpatient status of persons committed under various statutes including section 1026) provides: "Outpatient status shall be for a period not to exceed one year. At the end of the period of outpatient status approved by the court, the court shall, after actual notice . . . and after a hearing in court, either discharge the person from commitment under appropriate provisions of the law, order the person confined to a treatment facility, or renew its approval of outpatient status."

extended his outpatient status for another year and set a trial date to determine the restoration of defendant's sanity. On September 17, 1992, a jury found defendant's sanity had not been restored.

In 1993 and 1994, CONREP submitted annual reports to the court and recommended each time that defendant's outpatient status be extended for another year. Defendant contested these requests but the court extended his outpatient placement after conducting hearings.

In 1995, 1996, 1997, and 1998, CONREP submitted annual reports to the court and recommended each time that defendant's outpatient status be extended for another year. In each instance, defendant did not contest the extension and the court extended his outpatient status.

On April 1, 1999, defendant's mother complained to CONREP that defendant was not taking his medication, was carrying a hammer "for protection," and was threatening to leave the state. CONREP immediately requested revocation of defendant's outpatient status, which request was granted by the court.

On September 18, 2000, the Shasta County District Attorney petitioned the court for a two-year extension of defendant's commitment pursuant to section 1026.5. On January 5, 2001, jury trial was waived and a bench trial to be submitted on medical reports was set for January 11, 2001. A readiness conference was scheduled for January 10, 2001.

At the January 10, 2001, readiness conference, defendant withdrew his request for trial and conceded that he still fell within provisions of section 1026 for recommitment. Defendant's counsel concurred that this concession was in defendant's best interests. The court accepted the stipulation but also indicated it had reviewed the two medical reports which were to be the only evidence produced at the scheduled trial.

The medical report of Dr. Ray H. Carlson was prepared after an examination of defendant and a review of his records. Based on his evaluation of defendant, Dr. Carlson concluded defendant's current mental status and level of insight make him an unacceptable risk to be maintained in the community and concurred with the Napa State Hospital staff in recommending further compulsory treatment.

Dr. Kent R. Caruso also prepared a medical report after an examination of defendant and reviewing file information. He also found that defendant exhibited marginal levels of insight and that defendant tended to distort

reality. Based on his evaluation, Dr. Caruso concluded that defendant "still represents a substantial danger of physical harm to others in the community."

The court indicated that, having considered and adopted those medical reports, it would have made the determination that defendant remained an unacceptable risk to the community and should be recommitted to Napa State Hospital under section 1026.5, but that it accepted defendant's stipulation. The court then ordered defendant's commitment be extended for two years. Defendant appeals from the January 10, 2001, recommitment order.[3]

DISCUSSION

## I. Statutory Scheme

"Under the California procedure for commitment of insanity acquittees, if a defendant is judged not guilty of a felony because of legal insanity, he may be committed to the Department of Mental Health for a period of time which does not exceed the maximum state prison term to which he could have been sentenced for the underlying offense. (§§ 1026, 1026.5, subd. (a)(1) [fn. 1, *ante*].) Section 1026.2 provides that a defendant must be released when his sanity is restored. Section 1026.5, subdivision (a)(1) requires his release when the maximum period has expired. At the end of the maximum time period, however, the district attorney may petition to extend the commitment if the patient presents a substantial risk of physical harm to others because of a mental disease, defect or disorder. (§ 1026.5, subd. (b)(1) [fn. 1, *ante*].) . . . [S]ection 1026.5, subdivision (b)(8) [(§ 1026.5(b)(8))[4]] limits each extension of commitment to a two-year period. In order for the confinement to be extended, the prosecution must show beyond a reasonable doubt that the patient is mentally ill and a physical danger to others. [Citation.]" (*People v. Wilder* (1995) 33 Cal.App.4th 90, 98 [39 Cal.Rptr.2d 247]; see also *People v. Tilbury* (1991) 54 Cal.3d 56, 63 [284 Cal.Rptr. 288, 813 P.2d 1318].)

---

[3]The order is appealable as an order after judgment. (Code Civ. Proc., § 904.1, subd. (a)(2).)

[4]Section 1026.5, subdivision (b)(8), provides: "If the court or jury finds that the patient is a person described in paragraph (1), the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed. This commitment shall be for an additional period of two years from the date of termination of the previous commitment, and the person may not be kept in actual custody longer than two years unless another extension of commitment is obtained in accordance with the provisions of this subdivision. *Time spent on outpatient status, except when placed in a locked facility at the direction of the outpatient supervisor, shall not count as actual custody and shall not be credited toward the person's maximum term of commitment or toward the person's term of extended commitment.*" (Italics added.)

However, time spent on outpatient status does not count in the calculation of the maximum term of commitment. (§ 1026.5(b)(8) [fn. 4, *ante*].) Outpatient status is subject to annual review by the trial court pursuant to section 1606 (fn. 2, *ante*).

"[P]roceedings to extend the commitment of a patient under section 1026.5, subdivision (b), though they include many constitutional protections relating to criminal proceedings [(see § 1026.5, subd. (b)(7))], are essentially civil in nature. [Citation.] At a hearing under section 1026.5, subdivision (b) the trier of fact is not concerned with the patient's avoidance of criminal responsibility, but only with treatment for his mental illness." (*People v. Wilder, supra*, 33 Cal.App.4th 90, 99.)

## II. *Outpatient Status*

 ██ ██ Except for an argument made in footnote 4 of his brief,[5] defendant concedes he was lawfully committed pursuant to the provisions of section 1026.5 (if the statute survives his constitutional challenge) because section 1026.5(b)(8), quoted at footnote 4, *ante*, expressly excludes time spent on outpatient status from the calculation of "actual custody" and "maximum term of commitment." (Though not cited by the parties, a similar provision appears in § 1600.5.[6])

Defendant contends section 1026.5(b)(8), by excluding time spent on outpatient status, makes possible an open-ended commitment, which violates his constitutional rights to due process and equal protection. He says he was in "legal limbo" for 11 years, during which the state never petitioned to extend the commitment. He argues section 1026.5 must be read to include the constructive custody of outpatient status in the running of the term of commitment, and if outpatient status is counted as constructive custody, his commitment expired in 1989 and was not extended. Therefore, the court in

---

[5]This argument is waived by raising it only in a footnote under an argument heading which gives no notice of the contention. (Cal. Rules of Court, former rule 15(a), see current rule 14(a); *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521] [reviewing court may disregard claims perfunctorily asserted without development and without clear indication they are intended to be discrete contentions]; *Placer Ranch Partners v. County of Placer* (2001) 91 Cal.App.4th 1336, 1343, fn. 9 [111 Cal.Rptr.2d 577]; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4 [41 Cal.Rptr.2d 263].)

[6]Section 1600.5 provides in part: "For a person . . . committed pursuant to Section 1026 or 1026.5 . . . who is placed on outpatient status under the provisions of this title, time spent on outpatient status, except when placed in a locked facility at the direction of the outpatient supervisor, shall not count as actual custody and shall not be credited toward the person's maximum term of commitment or toward the person's term of extended commitment."

2001 lacked jurisdiction to extend a commitment that no longer existed. We shall reject defendant's argument.[7]

Although defense counsel in the trial court did not object to the extension of defendant's commitment on the ground now asserted, appellate counsel asserts trial counsel was ineffective for failing to advance the argument in the trial court. We shall assume for purposes of this case that the principle of ineffective assistance of counsel applies to section 1026.5 proceedings. (But see *People v. Wilder, supra,* 33 Cal.App.4th 90, 99 [§ 1026.5, subd. (b) proceedings, though they may include many constitutional protections relating to criminal proceedings, are essentially civil in nature].) We will therefore consider defendant's appellate argument on its merits. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 [233 Cal.Rptr. 404, 729 P.2d 839] [in claim of ineffective assistance of counsel, defendant must show counsel's performance was deficient and defendant was prejudiced].) We shall conclude defendant's argument is without merit.

Defendant relies on the opinion of our Supreme Court in *In re Moye* (1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097] (*Moye*). He says *Moye* required that he be afforded a commitment hearing, at which the People would have the burden of proving substantial dangerousness, at the end of his seven-year term of commitment, even though he was on outpatient status. For this proposition, defendant seizes on the following language in *Moye*: "equal protection principles require a shifting of that burden [of proof on the question of restoration to sanity] to the People at the time when confinement, actual or *constructive*, has exceeded the maximum term for the underlying offense." (*Id.* at p. 463, italics added.)

However, a reading of *Moye* in its entirety indicates that this fleeting reference to constructive custody, whatever it may mean, does not include time spent on outpatient status. This is apparent from various passages in *Moye*. At the outset, it is important to note that *Moye* is an equal protection case that essentially held that persons who are involuntarily committed, pursuant to section 1026, were denied equal protection when their circumstance was compared with Mentally Disordered Sex Offenders (MDSO's). At the time *Moye* was written, as the Attorney General points out, former section 6316.1 of the Welfare and Institutions Code excluded outpatient

---

[7]Defendant does not cite the California Constitution and does not develop any argument that the California Constitution would yield a different result than the United States Constitution, and we therefore need not consider the matter. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1152, fn. 19 [81 Cal.Rptr.2d 492, 969 P.2d 584] [on "rare occasions" cases have been decided based on California Constitution regardless of whether the result was compelled as a matter of federal constitutional law, but court saw no pressing need to construe state Constitution independently where no party urged such an approach].)

status from the calculation of "actual custody." (*Moye, supra,* 22 Cal.3d 457, 464.) Thus, in discussing the equal protection problem, *Moye* makes clear at various points that equal protection (derived from a comparison with MDSO's) requires a commitment procedure only where the defendant is subject to *institutional* commitment beyond the term of his confinement. These references in *Moye* are as follows:

(a) "After the expiration of such maximum term, as extended, if further confinement and treatment is sought the People must either proceed in accordance with the civil commitment provisions of the Lanterman-Petris-Short Act (hereafter LPS act) (Welf. & Inst. Code, § 5000 et seq.) *or rely upon outpatient supervision.*" (*Moye, supra,* 22 Cal.3d 457, 460, italics added.)

(b) *Moye* relies in substantial part upon *People v. Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373] (*Feagley*) where, as *Moye* points out, *Feagley* said, "the state may not involuntarily confine a civilly committed mentally disordered sex offender for an indefinite period *in a prison setting* [i.e., in a state treatment facility located on prison grounds]." (*Feagley, supra,* at p. 376, quoted in *Moye, supra,* 22 Cal.3d 457, 463-464, italics added.)

(c) *Moye* then points out, "It is significant for our purposes to note that the term 'actual custody' in section 6316.1 does not include any periods of outpatient supervision in determining the maximum period of confinement." (*Moye, supra,* 22 Cal.3d 457, 464.)

(d) *Moye* says, "[w]e believe that constitutional demands of equal protection require a similar shifting of the burden of proof in favor of persons acquitted as insane, *in order to retain them in confinement* beyond the maximum term prescribed for the offense they committed while insane. [Citations.]" (*Moye, supra,* 22 Cal.3d 457, 466, italics added.)

(e) *Moye* continues, "in MDSO cases the Legislature has seen fit to provide that the period of *actual confinement* for treatment may not exceed the maximum period of punishment for the underlying offense, unless grounds for an extended commitment are shown. Similar protection must be accorded persons in petitioner's class." (*Moye, supra,* 22 Cal.3d 457, 466, italics added.)

(f) Finally, *Moye* describes its holding as follows, "Specifically, we hold that principles of equal protection require (subject to the availability of either an extended commitment as outlined below, or a civil commitment under the

LPS act) that *persons committed to a state institution* following acquittal of the criminal offense on the ground of their insanity *cannot be retained in institutional confinement* beyond the maximum term of punishment for the underlying offense of which, but for their insanity, they would have been convicted. To the extent practicable, and in the absence of further legislation applicable to commitments under . . . section 1026, calculation of the maximum term of punishment should be made in accordance with the principles expressed in section 6316.1 of the Welfare and Institutions Code." (*Moye, supra,* 22 Cal.3d 457, 467, italics added.) As the People note, and as the *Moye* court expressly said, section 6316.1 of the Welfare and Institutions Code (since repealed) excluded periods spent in outpatient treatment.

■ In short, *Moye* is of no assistance to defendant in this case because *Moye*'s holding was that there was an unconstitutional denial of equal protection of the laws as between MDSO committees and section 1026 committees. There is no such disparity here because both the MDSO statutes and the section 1026 series statutes treat outpatient status precisely the same: it does not count toward the maximum time of commitment. (Welf. & Inst. Code, § 6332[8] [MDSO's]; § 1026.5(b)(8), quoted at fn. 4, *ante*.) Consequently, there is no equal protection violation and *Moye* is inapplicable.

Defendant relies on *People v. Gunderson* (1991) 228 Cal.App.3d 1292 [279 Cal.Rptr. 494] (*Gunderson*), where Division Six of the Second District held that, "When a patient has been in actual custody for the longest term of imprisonment which could have been imposed for his crimes, outpatient status will not affect the running of the time on any extension of the MDSO commitment." (*Id.* at p. 1297.) Assuming *Gunderson* is correctly decided, it does not apply to our case. As the same court later made clear (in an opinion by the same justice), *Gunderson*'s rule applies only where a defendant has spent the maximum period of commitment in institutional confinement. (*People v. Superior Court (Henry)* (1993) 12 Cal.App.4th 1308, 1312 [15 Cal.Rptr.2d 896].) Here, because defendant has not served all of his commitment time in institutional confinement, he is like Henry and unlike Gunderson.

■ Defendant argues that, apart from *Moye*, he is similarly situated to prisoners on parole, who can be kept in constructive custody only for the

---

[8]Welfare and Institutions Code section 6332 (added by Stats. 1993-1994, 1st Ex.Sess., ch. 9, § 3, p. 8561.) provides: "For a person committed as a mentally disordered sex offender, whose term of commitment has been extended pursuant to former Section 6316.2 [of the Welfare and Institutions Code], and who is placed on outpatient status pursuant to Section 1604 of the Penal Code, time spent on outpatient status, except when placed in a locked facility at the direction of the outpatient supervisor, shall not count as actual custody and shall not be counted toward the person's maximum term of commitment or toward the person's term of extended commitment."

maximum period designated by statute. (§ 3000.[9]) He says he is denied due process and equal protection because he is treated differently from parolees. He cites authority for the proposition that parolees and outpatients (in other types of commitment, e.g., narcotic addict commitment) are similarly situated in terms of the constitutional liberty interest.

■ However, as we said in *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155 [88 Cal.Rptr.2d 696], "The constitutional guaranty of equal protection of the laws means simply that persons similarly situated with respect to the purpose of the law must be similarly treated under the law. [Citations.] If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.] The question is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]"

■ With respect to those found not guilty by reason of insanity, "[i]n general, the courts have recognized that '. . . persons acquitted by reason of insanity fall within a special class, thereby providing a rational basis for differences in the treatment afforded them. [Citations.]' [Citation.] After surveying state statutes, the United States Supreme Court referred to 'the widely and reasonably held view that insanity acquitees constitute a special class that should be treated differently from other candidates for commitment.' (*Jones* v. *United States* [(1983)] 463 U.S. 354, 370 [77 L.Ed.2d 694, 709, 103 S.Ct. 3043].)" (*People v. Beck* (1996) 47 Cal.App.4th 1676, 1687 [55 Cal.Rptr.2d 340] [Legislature could reasonably find that compelling interest in avoiding the premature release of an insanity aquitee justified requirement of a one-year program of outpatient treatment, which is an interest not found in the case of release of persons civilly committed or the parole of mentally disordered offenders].) "The rational basis for California's different treatment of insanity acquitees is that such a person initiates the commitment process himself by pleading and proving that mental illness has led him to commit a crime." (*People v. Tilbury, supra,* 54 Cal.3d 56, 68.)

Since defendant, who has been found not guilty by reason of insanity, is not similarly situated to a parolee, there is no violation of equal protection

[9]Section 3000 provides in part that at expiration of a term of imprisonment, "the inmate shall be released on parole for a period not exceeding three years [if sentenced under specified provisions or not exceeding five years in other specified cases]. [¶] . . . [¶]

"Time during which parole is suspended because the prisoner has absconded or has been returned to custody as a parole violator shall not be credited toward any period of parole unless the prisoner is found not guilty of the parole violation. However, in no case, except as provided in Section 3064, may a prisoner subject to three years on parole be retained under parole supervision or in custody for a period longer than four years from the date of his or her initial parole [and prisoner subject to five-year parole shall not be retained for period longer than seven years]."

when defendant is treated differently from a parolee. (See *People v. Buffington, supra,* 74 Cal.App.4th 1149.)

Moreover, with respect to the due process liberty interest asserted by defendant, " '[t]he State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate non-punitive governmental objective and has been historically so regarded. [Citation.]' [¶] . . . [¶]

". . . '[The United States Supreme Court has] sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a "mental illness" or "mental abnormality." [Citations.] These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.' [Citation.]" (*People v. Superior Court (Blakely)* (1997) 60 Cal.App.4th 202, 210 [70 Cal.Rptr.2d 388], discussing § 1026.5 and citing *Kansas v. Hendricks* (1997) 521 U.S. 346, 356-359 [117 S.Ct. 2072, 2079-2081, 138 L.Ed.2d 501], which addressed a Kansas statute concerning sexually violent predators.) The statutory scheme at issue in this case does not violate due process.

We conclude section 1026.5 does not violate defendant's constitutional rights.

### III. *Substantial Evidence*

Defendant also contends no substantial evidence supports the judgment because there was no substantial evidence that he continues to pose a substantial physical danger to others. His argument is not well founded.

First, defendant *conceded* he still fell within the provisions of section 1026.5, which requires he continue to pose a substantial physical danger to others. His stipulation and request to vacate the trial necessarily waives any contention that there was not substantial evidence to support the finding. Yet, even if defendant had not conceded the issue, there is substantial evidence to support the trial court's finding that defendant, nonetheless, remained an unacceptable risk to the community and should be recommitted to Napa State Hospital under section 1026.5.

"Whether a defendant 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony." (*People v. Superior Court (Blakely), supra,* 60 Cal.App.4th 202, 204-205.) "In reviewing the sufficiency of evidence to

support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]" (*People v. McCune* (1995) 37 Cal.App.4th 686, 694-695 [43 Cal.Rptr.2d 804].)

▆▆▆ By agreement of the parties, the only evidence to be presented at the extension hearing was the medical reports of two physicians who had examined defendant. There was no objection to the medical reports and no objection was made to the wording of the trial court's findings. Both reports note that defendant has a long history of chronic mental illness.

The report prepared by Dr. Caruso expressly found that defendant "still represents a substantial danger of physical harm to others in the community" and recommended that commitment be extended. This conclusion was based on an examination of defendant and was extensively supported by underlying findings. Specifically, Dr. Caruso assessed defendant as having a "very chronic and significant history of mental illness, and of sporadically and unpredictably behaving in ways that might be very dangerous to either himself or others." It appeared defendant "has failed to identify the environment and/or psychological precursors that cause him to act out, or ultimately to make decisions that might have a negative or destructive impact" and he continued to "display an inability to control or self-regulate his impulses and his decision making activities." Dr. Caruso concluded: "All indications are that [defendant] has been and remains an individual whose judgment and insight are poor, and he is someone who lacks the ability to coordinate and control impulses in a predictable and consistent manner. Thinking too often tends to be unrealistic and child like; and [defendant] appears to be a man who is still excessively dominated and driven by various facets of his mental illness so as to lead me to the opinion that [defendant] still represents a substantial danger of physical harm to others in the community."

The report prepared by Dr. Carlson agreed that defendant is "an unacceptable risk to be maintained in the community." Dr. Carlson found defendant is "somewhat erratic and unmotivated with respect to his participation in treatment at the hospital" and has a "minimal appreciation for the nature of his psychosis and the best ways in which to control it." It was noted that, at least once in the past, defendant had stopped taking his medication while on outpatient status and became actively psychotic.

The medical reports were prepared for the sole purpose of determining whether defendant continued to pose a substantial risk of physical harm to

others within the meaning of section 1026.5 and both recommended, based upon examinations and evaluations of defendant, an extension of defendant's commitment. Viewed in the light most favorable to the extension order, the court's determination that defendant should be recommitted to Napa State Hospital under section 1026.5 is supported by substantial evidence.

### DISPOSITION

The order appealed from is affirmed.

Scotland, P. J., and Davis, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 13, 2002. Brown, J., did not participate therein.