Filed 10/30/20

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047254 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS121859B) |
| v. | |
| ENRIQUE NUNEZ LOPEZ, | |
| Defendant and Appellant. | |

In 2014, a jury convicted petitioner Enrique Nunez Lopez of second degree murder under a natural and probable consequences theory, among other crimes. In a prior opinion, we affirmed Lopez's convictions on direct appeal (*People v. Lopez* (May 31, 2018, H042227) [nonpub. opn.]) (case No. H042227). Subsequently, Senate Bill No. 1437 amended the natural and probable consequences doctrine as it relates to murder. (Stats. 2018, ch. 1015, § 4.) Senate Bill No. 1437 also enacted Penal Code section 1170.95[1], which permits a person convicted of murder under a natural and probable consequences theory to petition the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts. A person is entitled to section 1170.95 relief if, among other things, he or she "could not be convicted of first or second degree murder" following the enactment of Senate Bill No. 1437. (§ 1170.95, subd. (a)(3).)

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

Lopez filed a section 1170.95 petition. The prosecutor conceded that Lopez had made a prima facie showing of entitlement to relief but opposed his petition on the ground that he could be convicted of second degree murder under a still-valid theory— implied malice. The trial court issued an order to show cause and held a hearing at which the prosecutor bore the burden "to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) Following the hearing, the court denied the petition, concluding that the prosecution had carried its burden to prove beyond a reasonable doubt that Lopez could still be convicted of murder under the current statute on an implied malice theory.

On appeal, Lopez raises four contentions. First, invoking *Apprendi*[2], he argues that he may not be denied section 1170.95 relief on the ground that he could be convicted of implied malice second degree murder absent a jury determination that he is in fact guilty of that crime beyond a reasonable doubt. Second, Lopez maintains that even if his jury trial right was not implicated, the trial court erred by denying his petition without finding that the prosecutor had proved each element of implied malice second degree murder beyond a reasonable doubt. He says that, instead, the trial court incorrectly applied a sufficiency of the evidence standard. Third, Lopez contends there is insufficient evidence that he is guilty of implied malice second degree murder. Finally, he seeks reversal on grounds that his counsel below suffered from a conflict of interest.

We hold that section 1170.95 requires the prosecutor to prove beyond a reasonable doubt each element of first or second degree murder under current law in order to establish ineligibility based on the third condition. We conclude that the trial court properly applied that standard here and that its ruling is supported by substantial evidence. We hold that section 1170.95 does not implicate Lopez's federal constitutional

---

[2] *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).

2

rights to have essential facts found by a jury beyond a reasonable doubt. And we reject Lopez's conflict of interest claim. For these reasons, we shall affirm.

## I. BACKGROUND

### A. Factual Summary[3]

In 2012, Lopez, then a member of the Sureño gang La Esperanza Trece (Espe), accused fellow gang member Daniel "Frosty" Fraga of being "no good" at a gang meeting. The meeting was attended by about 10 Espe members, including Juan Salazar, Jr. According to a number of Espe members, at Lopez's urging, the gang held a vote to determine whether Frosty was no good, meaning he could be killed by members of Espe. There was some disagreement among the Espe witnesses as to the outcome of the vote. Three testified that the group decided Frosty was no good. Two testified that the majority agreed Frosty was no good but that no final decision was made, either because they were awaiting proof or because only gang members in county jail can decide whether a person is no good. And two testified there was no vote; however, one of those witnesses (Lopez's brother) admitted having told police that the group had decided to kick Frosty out of the gang because he was no good. A gang expert testified that every Sureño and every member of the Mexican Mafia has an obligation to kill former Sureños who they know have been deemed no good.

Later on the day of the no good vote, Frosty—accompanied by his friend Hector "Osito" Reyes—confronted Lopez at the home of Salazar's girlfriend. Lopez, Salazar, and the other Espe members who had participated in the no good vote were hanging out there. A fight broke out. It began when Frosty punched Lopez. Lopez's brother, known as Dodger, came to Lopez's defense. When a gang member known as Shadow tried to break up the fight, Osito hit him in the head with the butt of a gun. Osito also hit Dodger

---

[3] We take the facts from our prior opinion in case No. H042227, where they are set forth more fully. On our own motion, we take judicial notice of that prior opinion. (Evid. Code, §§ 452, subd. (d), 459.)

3

in the head with the gun several times, inflicting an injury that required surgical staples. Lopez was stabbed in the arm during the fight. He and Dodger fled the house. Shadow ended up in the bathroom with Osito, who was still armed with a gun, and Frosty, who had a pair of scissors. Shadow was able to escape the bathroom unharmed and fell to the floor in the hall outside the bathroom. Salazar fatally shot Frosty and Osito from the hallway outside the bathroom, a distance of about nine feet from where their bodies were found. Frosty suffered three gunshot wounds; Osito suffered six or seven gunshot wounds. Some of each victim's gunshot wounds had a downward trajectory, which the forensic pathologist who performed the autopsies opined demonstrated that the victims were bending over or on the floor when they sustained those wounds.

## B. Procedural History

The Monterey County District Attorney charged Salazar and Lopez with two counts of murder each (counts 1-2; § 187, subd. (a)) and with the substantive offense of active participation in a criminal street gang (count 6; § 186.22, subd. (a)). They also were charged with battery with serious bodily injury (count 3; § 243, subd. (d)); assault with force likely to produce great bodily injury (count 4; § 245, subd. (a)(4)); and child abuse (count 5; § 273a, subd. (a)) arising out of the "checking" of a 17-year-old member of the gang as punishment for dating a Norteño.[4] Gang enhancement allegations were attached to counts 1 through 5.

A jury trial took place in August and September 2014. Salazar's defense to the murder charges was that he acted in self-defense or in defense of another, Shadow. The jury rejected those defenses and convicted Salazar of first degree murder of Frosty and Osito. Salazar was convicted on all of the other charges as well and jurors found true the gang allegations.

---

[4] "Checking"—a 13-second beating of a gang member by fellow gang members— is a common form of discipline in Sureño gangs.

4

At trial, the prosecutor argued that Lopez was guilty of the murders as an aider and abettor on the theory that the murders were the natural and probable consequence of the substantive gang offense (and specifically of Lopez's actions surrounding the no good vote). Jurors failed to reach a verdict as to count 1, which charged Lopez with Osito's murder; the court declared a mistrial as to that count. The jury convicted Lopez of second degree murder of Frosty and found true the gang allegation attached to that count. The jury also found Lopez guilty of counts 3 through 6 and found true the gang allegations attached to counts 3 through 5.

The trial court sentenced Lopez to 22 years to life in prison. In a prior opinion, we affirmed Lopez's convictions on direct appeal (case No. H042227).

Lopez filed a section 1170.95 petition on February 5, 2019. The trial court appointed the public defender to represent Lopez. The prosecutor conceded that Lopez had made a prima facie showing of entitlement to relief but opposed his petition on the ground that he could be convicted of murder under current law. The case proceeded to the hearing stage. No new evidence was admitted. Rather, the prosecutor argued that the trial evidence proved Lopez's guilt of second degree murder under an implied malice theory. Lopez's counsel contended that the evidence failed to prove that Lopez's act of calling for the no good vote was a proximate cause of Frosty's death. Lopez's counsel further argued that the evidence failed to show that Lopez acted with implied malice.

On September 15, 2019, the trial court denied the petition, stating that the People had carried their burden "to show beyond a reasonable doubt that [Lopez] could still be convicted of murder under the current statute." In reaching that conclusion, the court expressed the view that Lopez "certainly . . . would know" that "calling a meeting with associates and saying, [']Hey, I think, you know, so and so is no good' . . . meant [that] individual was basically marked for death."

Lopez timely appealed.

5

## II. DISCUSSION

### A. *Legal Standards Applicable to Section 1170.95 Petitions at the Hearing Stage*

Lopez argues that the trial court applied the incorrect legal standard when it denied his petition following the issuance of an order to show cause and a hearing. In his view, the trial court applied the test applicable to appellate claims of insufficient evidence—the substantial evidence standard of review—in concluding that he is ineligible for section 1170.95 relief. Lopez maintains the court should have required the prosecutor to prove the elements of a still-valid theory of murder beyond a reasonable doubt. The Attorney General's position as to the appropriate legal standard was not clear from his brief. At oral argument, the deputy attorney general clarified that position, asserting that the beyond a reasonable doubt standard of proof applies and that the trial court properly applied that standard here. The deputy attorney general further argued that applying the substantial evidence standard "wouldn't even make sense [because s]ubstantial evidence is an appellate [standard of] review and it depends on what the burden was below."

#### 1. *Legal Principles*

Senate Bill No. 1437, which became effective on January 1, 2019, was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) "Under the felony-murder rule as it existed prior to Senate Bill 1437, a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state." (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247-248 (*Lamoureux*).) Likewise, under the natural and probable consequences doctrine pre-Senate Bill No. 1437, " 'the mens rea of the aider and abettor with respect to

6

[the nontarget] offense [was] irrelevant and culpability [was] imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 164, superseded by statute as stated in *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1103, review granted Nov. 13, 2019, S258175.)

"Senate Bill 1437restricted the application of the felony murder rule and the natural and probable consequences doctrine, as applied to murder, by amending" sections 188 and 189. (*Lamoureux*, *supra*, 42 Cal.App.5th at p. 248.) "As amended, section 188 provides in pertinent part as follows: 'Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.' [Citation.]" (*Id*. at pp. 248-249.) "Section 189, subdivision (e), as amended, provides that a participant in a specified felony is liable for murder for a death during the commission of the offense only if one of the following is proven: '(1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . .' " (*Id*. at p. 248, fn. omitted.)

Senate Bill No. 1437 also enacted section 1170.95, subdivision (a), which provides: "A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder

7

following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."

After a petition is filed, the trial court must review it to "determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) That is, the trial court conducts a "prebriefing 'first prima facie review' . . . 'of statutory *eligibility* for resentencing[.]' " (*People v. Tarkington* (2020) 49 Cal.App.5th 892, 897, review granted Aug. 12, 2020, S263219, italics added.) If the trial court determines that the petitioner has made a prima facie showing of eligibility for relief, " 'the court must direct the prosecutor to file a response to the petition, permit the petitioner (through appointed counsel if requested) to file a reply and then determine, with the benefit of the parties' briefing and analysis, whether the petitioner has made a prima facie showing he or she is *entitled* to relief.' [Citation.]" (*Id*. at p. 898, italics added; see also *People v. Drayton* (2020) 47 Cal.App.5th 965, 975 ["section 1170.95[, subd.] (c) contemplates two separate assessments by the trial court of a prima facie showing: one focused on 'eligibility' for relief and the second on 'entitlement' to relief"]; cf. *People v. Cooper* (2020) 54 Cal.App.5th 106, 122-123 [holding that section 1170.95, subdivision (c) requires only a single prima facie review].)

"If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c).) Within 60 days thereafter, the court must hold a hearing to determine whether the petitioner is entitled to relief. (§ 1170.95, subd. (d)(1).) New or additional evidence may be offered at that hearing and "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)

8

We review questions of statutory interpretation de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71.) In doing so, we apply well settled principles of statutory construction. Our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) " 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' [Citation.]" (*Ibid.*)

> 2. *To Prove Ineligibility Based on the Third Condition, the Prosecutor Must Prove, Beyond a Reasonable Doubt, the Elements of Murder Under Current Law*

At the hearing stage, the prosecutor has the burden "to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) The statute does not affirmatively define the term "ineligible." Rather, it sets forth three conditions that must be satisfied by a petitioner seeking relief. (§ 1170.95, subd. (a).) Therefore, the prosecutor's burden at the hearing stage is to prove that at least one of the three conditions is not satisfied.

This appeal raises the question: what must the prosecutor show to prove ineligibility for failure to satisfy the third condition? That condition provides that "[t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(3).)

9

We begin by interpreting the term "convicted" as it is used in the third condition. A person stands " 'convicted' " upon the return of a guilty verdict after trial or the entry of a plea admitting guilt. (*People v. Davis* (2010) 185 Cal.App.4th 998, 1001.) In the context of section 1170.95, the petitioner contests his or her guilt of murder under the current law, so "convicted" does not refer to admission of guilt by plea. Instead, "convicted" can be construed as "found guilty if he or she were now tried." Using that interpretation of "convicted," the third condition can be construed as "petitioner could not be found guilty of first or second degree murder under the current law if he or she were now tried."[5]

The state bears the burden of proving a criminal defendant's guilt. (§ 1096.) The third condition can therefore be restated in the active voice as: "the state could not prove the petitioner's guilt of first or second degree murder under current law if he or she were now tried."

Next, we construe the term "could" as it is used in the third condition. The Oxford English Dictionary explains that where, as here, the word "could" is followed by an infinitive and appears in the main clause of a conditional sentence[6], it means "would be able to." (Oxford English Dict. Online (2020).)[7] Therefore, we construe "could" as

---

[5] We use the phrase "under the current law" as shorthand for the statutory language "because of changes to [s]ection 188 or 189 made effective January 1, 2019."

[6] A conditional sentence "often start[s] with 'if' or 'unless,' . . . [and] one half expresses something which depends on the other half." (Cambridge English Dict. Online (2020) <https://dictionary.cambridge.org/us/dictionary/english/conditional> [as of Oct. 27, 2020], archived at <https://perma.cc/66LT-SCLZ>.)

[7] <https://www.oed.com/view/Entry/26857?rskey=PD6tbG&result=eid> [as of Oct. 27, 2020], archived at: <https://perma.cc/Z6MW-PSF3> [definition 16.a]. The Oxford English Dictionary Online also notes that, in this context, "could" can express a "hypothetical objective possibility, opportunity, or absence of prohibitive conditions: would be permitted or enabled by the conditions of the case." (*Ibid.* [definition 15.a(b)]; see Merriam-Webster Dict. Online <https://unabridged.merriam-webster.com/unabridged/can> [as of Oct. 27, 2020], archived at: <https://perma.cc/M5P6-9ZS5> [as a "verbal auxiliary," "could" is used "to indicate

10

"would be able to."  And, using that construction of "could," we construe the third condition as:  "the state would not be able to prove the petitioner's guilt of first or second degree murder under current law if he or she were now tried."

Having construed the third condition, we turn to the question of what the prosecutor must show to prove that the third condition is not satisfied.  Because we have construed the third condition to mean "the state would not be able to prove the petitioner's guilt of first or second degree murder under current law if he or she were now tried," it follows that the prosecutor's burden is to prove that the state *would* be able to prove the petitioner's guilt of first or second degree murder under current law.  In that context, "would" expresses "a possibility or likelihood"—namely, the possibility or likelihood that the state can prove the petitioner's guilt of first or second degree murder under current law.  (American Heritage Dict. Online (2020) <https://ahdictionary.com/word/search.html?q=would> [as of Oct. 28, 2020], archived at: <https://perma.cc/PQW7-XYAB> [defining "would" as "[u]sed in the main clause of a conditional statement to express a possibility or likelihood"].)

The question raised by this appeal is how possible or likely must that outcome be. In other words, how confident must the trial court be in the state's ability to prove the petitioner's guilt of murder under current law in order to find petitioner ineligible for relief.  Must the prosecutor persuade the trial court that the state theoretically has the requisite ability because there is substantial evidence from which a reasonable trier of fact could convict?  Or must the prosecutor persuade the trial court beyond a reasonable doubt that the state has the requisite ability by proving beyond a reasonable doubt each element of murder?  In short, what is the standard of proof?  (*People v. Mary H.* (2016) 5 Cal.App.5th 246, 255 [" 'The function of a standard of proof . . . is to "instruct the

---

possibility"].)  As discussed below, "would" also expresses possibility in this context. Therefore, we see no practical difference between these two definitions of "could" in this case.

11

factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." ' [Citation.]".)

The statute itself provides the answer. Section 1170.95, subdivision (d)(3) expressly states that the beyond a reasonable doubt standard of proof applies. Accordingly, we construe the statute as requiring the prosecutor to prove beyond a reasonable doubt each element of first or second degree murder under current law in order to establish ineligibility based on the third condition.

Only one other court has weighed in on the nature of the required showing of ineligibility at the hearing stage. Our colleagues in Division One of the Second District recently concluded that "the prosecution must . . . prove beyond a reasonable doubt that . . . a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder. This is essentially identical to the standard of substantial evidence, in which the reviewing court asks ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. . . . [¶] . . ." [Citation.]' [Citation.]" (*People v. Duke* (2020) 55 Cal.App.5th 113, 123.) For all the reasons discussed herein, we respectfully disagree with that conclusion.

Our reading of the statute is consistent with that of Judge J. Richard Couzens, Presiding Justice Tricia A. Bigelow, and Judge Gregg L. Prickett as set forth in their treatise on California sentencing law.[8] They conclude that, at the hearing stage, "[i]t is the burden of the prosecution to show, beyond a reasonable doubt, that the petitioner is guilty of murder under the law effective January 1, 2019." (Couzens, Bigelow & Prickett, Sentencing California Crimes (The Rutter Group Oct. 2019 update) § 23:51, p. 9.)

---

[8] Judge Couzens and Justice Bigelow have been described as "preeminent sentencing authorities." (*People v. Hul* (2013) 213 Cal.App.4th 182, 187.)

12

We recognize that superficial parallels exist between the language of the substantial evidence standard of review and the language of section 1170.95. Under the substantial evidence standard, " 'the court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]' " (*People v. Johnson* (2019) 32 Cal.App.5th 26, 57.) Thus, the substantial evidence standard asks whether a reasonable trier of fact *could* find the defendant guilty *beyond a reasonable doubt*. Section 1170.95 also uses the word "could" and the phrase "beyond a reasonable doubt"; it requires a showing *beyond a reasonable doubt* that the petitioner *could* be convicted of murder under current law. However, as discussed below, the procedural context in which the substantial evidence standard applies and the rationale underlying it convince us that the legislature did not intend to import it into section 1170.95.

As noted, the substantial evidence standard is one applied by an appellate court on appeal of a judgment of conviction. It is not a standard of proof to be employed by a factfinder. The substantial evidence standard is a deferential one under which the court of appeal " 'presume[s] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Fromuth* (2016) 2 Cal.App.5th 91, 104.) As such, the "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319, fn. omitted, superseded in part on other grounds by 28 U.S.C. § 2254(d).) By contrast, the section 1170.95 ineligibility inquiry is made by the trial court. And, in making that

inquiry, the trial court may be confronted with new evidence (§ 1170.95, subd. (d)(3)) and frequently will be asked to find newly relevant facts not previously admitted or found by a trier of fact (i.e., whether the petitioner acted with malice or was a major participant in an underlying felony and acted with reckless indifference to human life) (§§ 188, subd. (a)(3); 189, subd. (e)(3)). Given these circumstances, the rationale underlying the application of the deferential substantial evidence standard is not implicated.

There is a circumstance in which the substantial evidence standard is applied by a trial court: " ' "in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 . . . .' " [Citation.] "The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case." [Citations.] The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 249.) The rationale for applying the substantial evidence standard to a section 1118.1 motion—ensuring "speedy acquittals of criminal charges which are not supported by substantial evidence" (*People v. Odom* (1970) 3 Cal.App.3d 559, 565)—likewise is not implicated in the section 1170.95 context where the question is whether the petitioner's existing murder conviction should be vacated.

In sum, we hold that to establish a petitioner's ineligibility for section 1170.95 relief for failure to satisfy the third condition, the prosecutor must prove beyond a reasonable doubt the elements of first or second degree murder under the current law.

### 3. *The Trial Court Applied the Correct Legal Standard*

As noted, Lopez argues that the trial court failed to apply the correct standard, instead denying his petition based merely on the existence of sufficient evidence to support a murder conviction. For that argument, he relies on the trial court's ruling that the People met their burden "to show beyond a reasonable doubt that [Lopez] could still be convicted of murder . . . ." But that statement provides no support for Lopez's

14

position, as the trial court merely used the statutory language. As discussed above, the third condition is that "[t]he petitioner could not be convicted of first or second degree murder" under the current law. (§ 1170.95, subd. (a)(3).) And the prosecutor must prove the inverse—that petitioner could be convicted of degree murder under the current law. The trial court's use of the statutory language does not convince us that the court misapplied the law.

Moreover, the record persuades us that the trial court applied the proper standard. First, the parties correctly argued below that the trial court could deny the petition only if it found that the elements of second degree implied malice murder had been proved beyond a reasonable doubt. Specifically, the prosecutor argued that the petition should be denied because "Lopez is guilty of second-degree murder" because his acts were the proximate cause of the Frosty's death and because Lopez acted with a reckless indifference to human life. And the prosecutor urged the trial court to "find that Lopez acted with a reckless indifference to human life when he organized a criminal street gang meeting for the sole purpose of having Fraga determined to be no-good." The prosecutor did not ask the court to apply the substantial evidence standard. Lopez's trial court brief asserted that the pertinent question was "whether the facts show beyond a reasonable doubt that, with implied malice, Lopez caused the death of Frosty." At the hearing, Lopez's counsel framed the question as "whether or not implied malice was proven beyond a reasonable doubt." Neither the prosecutor nor the trial court took issue with defense counsel's characterization of the applicable legal standard.

Second, the trial court's statements at the hearing indicate that it applied the correct standard. The court concluded that the elements of implied malice murder "were satisfied with the evidence that was brought out during the trial, and of course, I was the trial judge." As to Lopez's mens rea, the court stated that trial testimony showed that Lopez knew that voting Frosty "no good" meant Frosty "was basically marked for death." The foregoing statements show that the court understood it was required to find the

15

elements of murder had been proved, not find merely that there was sufficient evidence from which some hypothetical jury could make such findings.  Moreover, the trial court referenced the beyond a reasonable doubt standard of proof and never used the words "substantial evidence," "sufficient evidence," or made any other indication that it was applying a sufficiency of the evidence standard.

### B.      Sufficiency of the Evidence Supporting the Trial Court's Ruling

Next, Lopez challenges the denial of his petition on grounds of insufficient evidence.  He says the trial evidence showed neither that his acts were the proximate cause of Frosty's death, nor that he acted with the requisite mens rea.

#### 1.      Legal Principles and Standard of Review

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]  Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied.  [Citation.]  'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.]' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)  Our Supreme Court has " 'interpreted implied malice as having "both a physical and a mental component.  The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.]  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' [Citation.]" ' [Citation.]" (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

Of course, " '[a]n element of [any] homicide is that the defendant's criminal act or omission be the proximate cause of the death. [Citation.]' [Citation.]" (*Zemek v.*

16

*Superior Court* (2020) 44 Cal.App.5th 535, 552; CALCRIM No. 520 [listing "The defendant committed an act that caused the death" as an element of implied malice murder].) An act "causes death if the death is the direct, natural, and probable consequence of the (act/[or] failure to act) and the death would not have happened without the (act/[or] failure to act). A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . . [¶] [There may be more than one cause of death. (An act/[or] (A/a failure to act) causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.]" (CALCRIM No. 520.) " '[A]n "independent" intervening cause will absolve a defendant of criminal liability.' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 871 (*Cervantes*).) An independent intervening cause is " ' "unforeseeable[,] . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." ' " (*Ibid.*) By contrast, a dependent intervening cause—one that " ' "is a normal and reasonably foreseeable result of defendant's original act" ' "—does not relieve the defendant of criminal liability. (*Ibid.*)

As discussed above, we review sufficiency of the evidence challenges to judgments of conviction for substantial evidence. The same standard applies to the review of post judgment orders, such as section 1026.5 orders extending state hospital commitments (*People v. Crosswhite* (2002) 101 Cal.App.4th 494, 507-508) and orders denying resentencing under section 1170.18 (Proposition 47) (*People v. Sledge* (2017) 7 Cal.App.5th 1089, 1096). But Lopez urges us to apply an independent standard of review, which he says applies to the review of orders based on findings "made by a postconviction trial court based upon review of transcripts." He argues that no deference to the trial court's factual findings is appropriate because "the trial court primarily reviewed this Court's [prior] opinion and the probation report" and did not rely on the "credibility of live witnesses."

We are not persuaded. As noted above, the substantial evidence standard of review is not reserved for the review of jury findings; it has been applied to post judgment orders involving judicial factfinding. Furthermore, the record does not support Lopez's contention that the trial court relied primarily on documentary evidence. Rather, in making her factual findings, the trial court judge referenced witness testimony as to the meaning of a no good determination and trial evidence more generally, noting that she "was the trial judge." While the trial court judge noted that she also reviewed this court's prior decision, the parties' briefs, the probation reports, and "some of [her] notes at the time and that [she] made . . . in preparation of sentencing," the record as a whole demonstrates that she made her findings based on the trial evidence, which she observed firsthand. We shall apply the substantial evidence standard of review.

### 2. There is Sufficient Evidence of Proximate Causation

Lopez argues there was insufficient evidence that his acts surrounding the no good vote were the proximate cause of Frosty's death because Frosty's attack and Salazar's premeditated shooting constituted independent intervening causes which absolved him of any liability for Frosty's death.[9]

To reiterate, an independent intervening cause is " ' "unforeseeable[,] . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." ' " (*Cervantes*, *supra*, 26 Cal.4th at p. 871.) By contrast, " ' "[i]f an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[ ] The consequence need not have been a strong

---

[9] Lopez couches this argument as an attack on the sufficiency of the evidence of implied malice. However, it is more accurately characterized as a challenge to the sufficiency of the evidence of proximate causation and we treat it as such. As noted, implied malice and proximate causation are distinct elements of implied malice murder. *Cervantes*, *supra*, 26 Cal.4th at p. 872, the case on which Lopez relies, involved a challenge to the sufficiency of the evidence of the "element of proximate causation."

probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citations.]" ' " (*Ibid.*)

Substantial evidence supports the trial court's implied finding that Frosty's act of starting a physical fight with Lopez was a dependent intervening cause. At trial, three Espe members and the gang expert each testified that a gang member who is accused of being no good would be expected to confront his or her accuser. The gang expert testified that the ensuing confrontation would be "violent," involving a fistfight and, in some instances, weapons. The trial court reasonably could have inferred from the foregoing testimony that Frosty's attack was a normal and reasonably foreseeable result of Lopez's acts of accusing Frosty of being no good and urging the gang to deem him no good.[10]

Substantial evidence likewise supports the trial court's implied finding that Salazar's act of shooting Frosty was a dependent intervening cause. The gang expert testified at trial that a gang member who has been deemed no good is "marked for death" and that every Sureño has an obligation to kill them. Six Espe members testified that someone who has been deemed no good can be killed by their former fellow gang members. Only Lopez's brother hedged on that point. And he admitted telling police that being no good could get you killed. The trial court reasonably could have concluded based on the foregoing testimony that Lopez " ' "should have foreseen the possibility" ' " of Frosty being killed by a member of Espe as the result of his actions surrounding the no good vote. (*Cervantes*, *supra*, 26 Cal.4th at p. 871.)

---

[10] This implied finding arguably was compelled by the jury's verdict. As we noted in our decision on direct appeal, "[i]n reaching [its] verdict, . . . the jury must have concluded that Frosty's act of starting a physical fight with Lopez was not ' " "an extraordinary and abnormal occurrence.' " ' (*Cervantes*, *supra*, 26 Cal.4th at p. 871.)"

We reject Lopez's argument that our prior opinion in his direct appeal in any way "preclude[d] a finding that Salazar's shooting of Frosty was reasonably foreseeable." On direct appeal, Lopez argued that his trial counsel rendered ineffective assistance by persuading the trial court not to give the jury manslaughter verdict forms. We rejected that claim, reasoning that there was no evidence from which a reasonable jury could have concluded that it was reasonably foreseeable that Salazar would kill Frosty *in a heat of passion*, thereby committing voluntary manslaughter for which Lopez could be liable under a natural and probable consequences theory. We did not conclude that a deliberate killing by Salazar (or any other Espe member) based on the no good order was unforeseeable.

*Cervantes*, on which Lopez relies, is distinguishable. In *Cervantes*, the defendant was "a member of a street gang, who perpetrated a nonfatal shooting that quickly precipitated a revenge killing by members of an opposing street gang." (*Cervantes*, *supra*, 26 Cal.4th at p. 863.) Our Supreme Court reversed the defendant's conviction for second degree murder under the provocative act doctrine, finding insufficient evidence of proximate causation. The court reasoned that "the actual murderers were not responding to defendant's provocative act"; they " 'intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him,' a circumstance that is 'normally held to relieve the first actor [defendant] of criminal responsibility.' " (*Id.* at pp. 872-874.) Here, the People have never advanced a provocative act theory of murder. More significantly, there was evidence in this case from which a trier of fact could have concluded that Salazar killed Frosty in response to the no good vote (which Lopez instigated). And, unlike in *Cervantes*, here Salazar and Lopez were in the same gang, so it was not the case that Salazar was exploiting a situation created by Lopez without acting in concert with him.

### 3. There is Sufficient Evidence of the Mental Component of Implied Malice

Lopez also challenges the sufficiency of the evidence of the mental component of implied malice—that is, his knowledge that his conduct endangered the life of another and that he acted with conscious disregard for life.

As previously discussed, the trial evidence showed that Lopez encouraged his fellow gang members to deem Frosty no good and, at Lopez's urging, a vote to do just that was held. The gang expert and nearly every Espe witness testified that a gang member who has been deemed no good is subject to being killed by his former fellow gang members. According to the gang expert, Sureño gang members are *obligated* to kill someone who has been deemed no good. This evidence amply supports the reasonable inferences that Lopez knew that calling for Frosty to be declared no good endangered Frosty's life and that Lopez nevertheless did so with conscious disregard for Frosty's life.

To support his insufficiency of the evidence claim, Lopez notes that the Espe witnesses and the gang expert testified that they were unaware of any Espe gang member ever having been killed as a result of being deemed no good. It is true that none of the Espe witnesses knew of an Espe gang member ever being killed for being no good. However, those witnesses were not asked whether—apart from Frosty—they even knew of an Espe gang member being deemed no good. And while the gang expert was unable to identify another incident in which a member of Espe had killed another member of Espe for being no good, he emphasized that he "did not research previous murders associated to La Esperanza members being deemed no good." Accordingly, the significance of the testimony on which Lopez relies is unclear. It might reasonably be interpreted as demonstrating that no good orders are rare.

Moreover, there was no shortage of evidence that Espe was a violent gang. Shadow testified that by the time of the 2012 gang meeting, he had not been active in the gang for a few years. He attended the meeting only because he felt he "had no choice"

21

but to go because he feared for his safety and safety of family if he refused. Melina testified that when Espe members arrived at her house on the day of the 2012 gang meeting she "thought that they were going to shoot up [her] house" because she was dating a Norteño. Instead, they drove her to the gang meeting and, eventually, three members of the gang beat her up for violating gang rules. This evidence, combined with the evidence discussed above regarding the meaning of a no good order, supports the reasonable inferences that Lopez knew his actions endangered Frosty's life and that Lopez acted with conscious disregard for Frosty's life.

### C. *Lopez's Constitutional Rights Are Not Implicated by Section 1170.95*

Lopez argues that permitting a trial court to make the factual findings underpinning a determination of ineligibility for section 1170.95 relief violates his federal constitutional rights.

The Due Process Clause of the Fourteenth Amendment and the jury-trial guarantee of the Sixth Amendment, "[t]aken together, . . . indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*Apprendi*, *supra*, 530 U.S. at pp. 476-477.) In *Apprendi*, the United States Supreme Court held that the federal constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id*. at p. 490.)

Lopez argues that where the prosecutor seeks to prove a petitioner's ineligibility for section 1170.95 relief for failure to satisfy the third condition, *Apprendi* requires that petitioner's guilt of murder be proved to a jury. We disagree.

Section 1170.95 petitioners are not criminal defendants charged anew with murder and constitutionally entitled to a jury trial. Instead, they stand convicted of murder, their convictions are final, and they can constitutionally be punished for murder despite the ameliorative changes to the law of murder enacted by Senate Bill No. 1437. (See *People*

22

*v. Conley* (2016) 63 Cal.4th 646, 656 ["the Legislature . . . may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments if it so chooses"]; Gov. Code, § 9608 ["[t]he termination or suspension (by whatsoever means effected) of any law creating a criminal offense does not constitute a bar to the indictment or information and punishment of an act already committed in violation of the law so terminated or suspended, unless the intention to bar such indictment or information and punishment is expressly declared by an applicable provision of law"]; *Dillon v. United States* (2010) 560 U.S. 817, 828 ["We are aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent Guidelines amendments"].)  Accordingly, "the sentence-[vacatur and] modification proceedings authorized by [section 1170.95] are not constitutionally compelled. . . . Rather, [section 1170.95] represents a [legislative] act of lenity . . . .  [¶]  Viewed that way, proceedings under [section 1170.95] do not implicate the Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt."  (*Ibid.*)  Our colleagues in the First District reached the same conclusion in *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156.

Furthermore, a factual finding that results in ineligibility for section 1170.95 relief does not increase the penalty for a crime.  "[I]t simply leaves the original sentence intact."  (*People v. Perez* (2018) 4 Cal.5th 1055, 1064 (*Perez*).)  Accordingly, *Apprendi* is not implicated and "the Sixth Amendment does not prohibit trial courts from relying on facts not found by a jury in determining" section 1170.95 eligibility.  (*Perez*, *supra*, at p. 1064 [addressing Proposition 36 resentencing].)

### D.    *Attorney Conflict of Interest*

Finally, Lopez argues his attorney below suffered from an actual conflict of interest such that he was deprived of his Sixth Amendment right to the assistance of counsel.  Lopez was represented on his section 1170.95 petition in the trial court by Assistant Public Defender Jeremy Dzubay of the Monterey County Public Defender's

23

Office.  The Public Defender, Susan Chapman, represented Lopez's co-defendant—Salazar—at their joint trial.  Lopez says Chapman's prior representation of Salazar constitutes a conflict of interest that must be imputed to Dzubay and that requires automatic reversal.

### 1.     *Factual Background*

Lopez was tried jointly with Salazar in 2014.  At trial, Lopez was represented by attorney Joseph Martin, as the Monterey County Public Defender's Office had declared a conflict as to Lopez.  Salazar was represented by Chapman, who was then with the alternate defender's office.  Chapman later became the Monterey County Public Defender, a position she held when Lopez filed his section 1170.95 petition.

Shortly after Lopez filed his petition, attorney Marc Zilversmit filed a motion for appointment of counsel on Lopez's behalf.  Zilversmit was Lopez's appointed appellate counsel on direct appeal and represents him in the current appeal.  In the motion, Zilversmit stated that his own appointment as Lopez's attorney would be appropriate based on his professional qualifications and familiarity with the case.  The motion did not mention any potential conflict of interest that might preclude the appointment of the public defender.

Both Zilversmit and a deputy public defender appeared for Lopez at the first hearing on the petition on February 14, 2019.  At that hearing, Zilversmit stated "I think your honor recalls that there was a conflict with the public defender who was representing the codefendant in this two-defendant case."  It is not clear whether this was a reference to Chapman's prior representation of Salazar.  The trial court apparently understood it as a reference to the fact that the public defender's office had declared a conflict as to Lopez prior to trial, responding:  "[n]onetheless, even when probation violations come in or other matters where the public defender has conflicted out, we still go through that procedure, even though it may seem obvious to us that there may be another conflict filed.  Sometimes there isn't, for whatever reason."  The trial court

24

declined to appoint Zilversmit, explaining that County procedures require the appointment of the public defender's office in the first instance, and then of the alternate defender's office in the event the public defender's office declares a conflict.

The public defender's office accepted the appointment pending a determination as to the existence of any conflict. At a hearing a week later, Dzubay appeared for Lopez and indicated that the public defender's office would not be declaring a conflict. Dzubay represented Lopez throughout the proceedings below.

### 2. *Legal Principles*

"Both the United States Constitution and the California Constitution guarantee criminal defendants the right to the assistance of counsel unburdened by any conflicts of interest. [Citation.] Essentially, a claim of conflict of interest constitutes a form of ineffective assistance of counsel. [Citations.] In order to demonstrate a violation of the federal and state Constitutions based on a conflict of interest, a defendant must show that his or her counsel was burdened by an 'actual' conflict of interest—one that in fact adversely affected counsel's performance. [Citation.] When determining whether counsel's performance was ' "adversely affected" ' by the purported conflict under this standard, we consider whether ' "counsel 'pulled his punches,' i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict." ' [Citation.]" (*People v. Perez* (2018) 4 Cal.5th 421, 435.) " ' "In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." ' [Citation.]" (*People v. Johnson* (2018) 6 Cal.5th 541, 578.)

25

The United States Supreme Court has created a narrow exception to the foregoing. Reversal is automatic "where defense counsel is forced to [jointly] represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." (*Mickens v. Taylor* (2002) 535 U.S. 162, 168, citing *Holloway v. Arkansas* (1978) 435 U.S. 475, 488 ["whenever a trial court improperly requires joint representation over timely objection reversal is automatic"].)

### 3. Analysis

Lopez contends that the automatic reversal rule applies here. It does not for two independent reasons. This is not a case of joint representation of codefendants, but of successive representation. And Lopez's counsel—Dzubay and the public defender's office—did not object. Nor did Zilversmit bring the alleged conflict to the attention of the trial court judge. As noted above, he stated only, "I think your honor recalls that there was a conflict with the public defender who was representing the codefendant in this two-defendant case." The record demonstrates that that vague statement failed to make the trial court judge aware that the current public defender represented Lopez's co-defendant at trial. Instead, the trial court reasonably interpreted Zilversmit's statement as referring to the fact that the public defender's office had declared a conflict as to Lopez years earlier.

Because automatic reversal is not required, Lopez must demonstrate that his counsel's performance was adversely affected by the purported conflict. He attempts to carry that burden by faulting counsel below for not asking for an evidentiary hearing, not calling Salazar as a witness regarding the no good meeting and discussion, and not blaming Salazar for acting independently from Lopez and the no-good meeting. Lopez claims these unpursued strategies were adverse to Salazar, but potentially helpful to him. Lopez fails to show that counsel's performance was adversely affected.

First, the parties were free to offer evidence at the section 1170.95, subdivision (d) hearing; they simply chose not to. Accordingly, counsel had no reason to request an evidentiary hearing; such a hearing was held.

Second, Lopez gives us no reason to suspect that conflict-free counsel would have called Salazar as a witness. Salazar did not testify at trial and we are unaware of any statements he has made about the gang meeting and the no good vote. Accordingly, Lopez's suggestion that Salazar's testimony would have been favorable to him is purely speculative. Moreover, numerous Espe witnesses testified at trial regarding the gang meeting and the no good vote. Had Salazar offered a starkly different account of those events at the hearing, it is unlikely that the trial court would have credited it.

Third, Lopez fails to show that conflict-free counsel would have been able to more persuasively argue that Salazar killed Frosty for reasons unrelated to Lopez and the no good vote. Counsel below squarely placed the blame for Frosty's death on Salazar, arguing in his brief: "The injury that caused Frosty's death was the gunshot wounds inflicted by Salazar. Lopez's physical act of calling a meeting could not cause Frosty's death because it was not directly connected with the gunshot wounds." Counsel below did not concede that Salazar was acting pursuant to the no good vote. Nor did Chapman make that argument at trial. To the contrary, she argued that Salazar killed Frosty for reasons unrelated to Lopez and the no good vote—namely, in self-defense and defense of another. The jury rejected those defenses when it convicted Salazar of first degree murder. Lopez points to no evidence (and we are aware of none) suggesting that Salazar had any motive to kill Frosty—a member of his own gang—other than because Frosty had been deemed no good. Accordingly, it is unclear what more counsel could have done to argue that Salazar acted independently of the no good vote.

For the foregoing reasons, Lopez's conflict of interest claim fails.

III.    **DISPOSITION**

The order is affirmed.

27

_____

ELIA, J.

WE CONCUR:


_____

PREMO, Acting P.J.


_____

BAMATTRE-MANOUKIAN, J.


*People v. Lopez*
H047254

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Superior Court No: SS121859B |
| Trial Judge: | Honorable Carrie McIntyre Panetta |
| Counsel for Plaintiff and Appellant:<br>THE PEOPLE | Xavier Becerra<br>Attorney General |
| | Lance E. Winters<br>Chief Assistant Attorney General |
| | Jeffrey M. Laurence<br>Senior Assistant Attorney General |
| | Catherine A. Rivlin<br>Supervising Deputy Attorney General |
| | Bruce M. Slavin<br>Deputy Attorney General |
| Counsel for Defendant and Respondent:<br>ENRIQUE NUÑEZ LOPEZ | Marc J. Zilversmit |