Filed 6/30/22

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

MICHAEL DIGGS,

    Defendant and Appellant.

</td><td>

A162679

(Alameda County
Super. Ct. No. 175035)

</td></tr>
</table>

Defendant Michael Diggs appeals from the trial court's denial of his petition for conditional release on the ground of restoration of sanity pursuant to Penal Code section 1026.2.[1]  We find that the trial court did not abuse its discretion in denying the petition and that neither defendant's due process nor equal protection rights were violated.  We therefore affirm.

**BACKGROUND**

**A.** *The Underlying Offense and Commitment*

The commitment offense was for first degree murder.  In 2014, Diggs sold methamphetamine to the victim, went to the victim's house, and fell asleep on the couch while the victim smoked the methamphetamine. According to Diggs, he woke up to find the victim on top of him, unclothed. This triggered a flashback to sexual abuse Diggs had experienced as a child

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 2, 3, and 4 of the Discussion.

[1] All statutory references are to the Penal Code unless otherwise specified.

and he reacted by striking the victim repeatedly with a hatchet, killing him. Diggs proceeded to pour bleach, Epsom salt, and other products on the victim to supposedly get rid of evil spirits. Diggs then left the house. At the time of the offense, Diggs was on parole and had been heavily using methamphetamine for about 45 days. He continued to use substances after the offense.

In 2015, Diggs was found not guilty by reason of insanity (NGI) and was committed to Napa State Hospital (Napa) for a term of 50 years to life. Diggs was initially diagnosed with schizophrenia and posttraumatic stress disorder (PTSD). This diagnosis later changed to amphetamine-induced psychotic disorder, severe methamphetamine use disorder that was in sustained remission in a controlled environment, and antisocial personality disorder (ASPD) with narcissistic traits.

In January 2017, two Christmas cards were sent to Diggs at Napa that contained methamphetamine. Diggs denied having any involvement with these cards being sent. In June 2019, Diggs tested positive for methamphetamine following a random drug test. He claimed that the result was a false positive and that he had been set up. His sample was sent out for a second confirmatory test that also came back positive. Following this incident, Diggs refused to participate in any further drug testing or treatment at Napa. In October 2019, Diggs was transferred to Patton State Hospital (Patton).

**B.** *Petition for Conditional Release*

In December 2020, Diggs filed the subject petition for release into a conditional release program (CONREP) pursuant to section 1026.2. In March 2021, a hearing on the petition was held. Experts on behalf of both Diggs and the prosecution testified.

## 1. Defendant's Expert

Diggs' expert was Dr. Michael McCormick, a staff psychologist at Patton. McCormick began working with Diggs in January 2021 and reviewed Diggs' treatment records and police reports. McCormick also ran a relapse prevention group that Diggs regularly attended twice a week. McCormick testified that Diggs' main diagnosis was ASPD with narcissistic traits and a stimulant use disorder that was in remission in a controlled environment. According to McCormick, someone with ASPD may exhibit aggressive and manipulative behavior, lack of empathy, as well as a disregard for rules and violations. McCormick acknowledged that someone with ASPD could be dangerous under the standards of section 1026.2 but that he did not see any evidence that Diggs would be dangerous if released into CONREP.

In support of this opinion, McCormick testified that Diggs was able to accept feedback from their therapy sessions and implement it into his daily life. McCormick acknowledged that Diggs' current diagnosis could potentially make him dangerous if he were to use substances again but testified that Diggs had created a Wellness Recovery Action Plan that mitigated this danger.[2] McCormick testified that Diggs expressed an awareness of his triggers that could potentially lead to substance use again, his lack of desire to use any substances, and a desire to continue his recovery treatment once in the community. McCormick believed Diggs had made advancements in his ability to deal with substance abuse, despite the fact that he received Christmas cards containing methamphetamine in 2017 and tested positive for methamphetamine in 2019.

---

[2] A Wellness Recovery Plan is required of all patients at Patton who seek to be released into CONREP.

## 2. The Prosecution's Experts

The prosecution called Dr. Mario Souza, a senior psychologist specialist in the Forensic Evaluation Department at Patton. In October 2020, Diggs' treatment team asked Souza to conduct a violence risk assessment and evaluation of Diggs' current risk level and whether it was appropriate to discharge him to the community. Souza then prepared a court report based on his assessment. In preparing this report, Souza interviewed Diggs for approximately five hours and reviewed police reports, CONREP placement recommendations, and Diggs' treatment records.

Souza diagnosed Diggs with ASPD and amphetamine use disorder. Souza testified that Diggs had a history of not only criminal behavior, but also impulsivity, manipulative behavior, and lack of remorse, all of which were characteristics of ASPD. Souza further testified that Diggs' methamphetamine use led to significant issues and caused him to experience psychotic-like symptoms.

Souza employed the Historical Clinical Risk Management – 20 Version 3 (HCR-20) that he described was the "the gold standard of violence risk assessment." Of the ten historical factors that the HCR-20 considers, violence, antisocial behavior, personality disorder, substance use, traumatic experiences, and violent attitudes were all present and highly relevant for Diggs. Of the risk management factors, Souza found that Diggs' future treatment plans were inadequate, that Diggs would face future problems with personal support and his living situation, and that he did not have the adequate coping skills to deal with his maladaptive personality patterns and stressors in the community. Souza concluded that Patton was the best place for Diggs for the time being and that he would be able to move to a less restrictive environment once he engaged in in-depth substance abuse treatment.

The prosecution also called Janice Avery, an assistant community director at CONREP. Avery prepared a hospital liaison report in January 2021 that concluded that although Diggs was near readiness, he was not yet ready to be released to CONREP. Avery testified that Diggs had more progress to make with respect to gaining insight regarding his substance abuse Avery was also concerned that Diggs was diagnosed with a substance use disorder and had possibly used methamphetamine and had methamphetamine sent to him while he was at Napa.

### 3. The Trial Court's Ruling

The trial court denied Diggs' petition at the conclusion of the hearing. The court found that Diggs had not carried his burden in showing by a preponderance of the evidence that he would not be a danger to the community if released into CONREP.

The trial court stated its concern that "the nature of the offense which brought Mr. Diggs into the state hospitals as a result of a not guilty by reason of insanity finding, which was a murder and which occurred, apparently, because Mr. Diggs was placed in a psychotic state through his use of methamphetamines."

The trial court further noted that Diggs had not conquered his amphetamine use disorder since there were incidents of illegal possession and use of methamphetamine when he was at Napa. This was of particular concern to the court because the use of amphetamine, combined with Diggs' ASPD, "provide[d] the trigger to the very violent activity that we've seen." Finally, the court stated that Diggs had not "engaged in the meaningful treatment that is necessary for substance-use disorder to be ready for [release] at this time."

Diggs filed a timely notice of appeal.

## DISCUSSION

### 1. *Relevant Law and Standard of Review*

A defendant found not guilty by reason of insanity (NGI) may petition the court to be released from a state hospital prior to the expiration of his or her maximum term of commitment on the grounds of restoration of sanity. (§ 1026.2.)  The petition involves a two-step process.  The first step is an outpatient placement hearing, at which the applicant must prove by a preponderance of the evidence that he or she will not be "a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community."  (§ 1026.2, subds. (e), (k).)  If the court makes this finding, the applicant is "placed with an appropriate forensic conditional release program for one year."  (§ 1026.2, subd. (e).)

"The second step in the section 1026.2 release process is referred to as the restoration of sanity trial, and can only be reached if the applicant has already met the threshold test for placement in 'an appropriate forensic conditional release program.' "  (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1433.)  The applicant again bears the burden to prove by a preponderance of the evidence that he or she will not be a danger due to mental defect, disease, or disorder.  (§ 1026.2, subds. (e), (k).)

The present appeal concerns a petition for outpatient placement under the first step of section 1026.2.  The trial court's denial of Diggs' petition is reviewed for abuse of discretion.  (*People v. Cross* (2005) 127 Cal.App.4th 63, 73.)  "The term judicial discretion implies the absence of arbitrary determination, capricious disposition, or whimsical thinking.  [Citation.] 'When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion.  An appellate tribunal is not

authorized to substitute its judgment for that of the trial judge. [Citation.]'
[Citation.] Discretion is abused only if the court exceeds all bounds of
reasons, all of the circumstances being considered." (*People v. Henderson*
(1986) 187 Cal.App.3d 1263, 1268.)

## 2. *Finding of Danger to the Health and Safety of Others*

Diggs contends that the evidence did not support the trial court's
finding that Diggs would be dangerous if released into CONREP. We
disagree.

As an initial issue, Diggs argues that the term "danger to the health
and safety of others" under section 1026.2 is undefined and should therefore
be read to mean "substantial danger of physical harm to others" as included
under section 1026.5, subdivision (b)(1).[3] We decline to do so as we have
already addressed this issue in *People v. Woodson* (1983) 140 Cal.App.3d 1.
There, we stated that those committed under section 1026 need not "all
represent a substantial danger of *physical* harm to others or themselves.
Whether they do represent a danger or not, depends on the nature of their
mental disease, defect, or disorder and the underlying crime." (*Id.* at p. 4.)
Accordingly, we held that "[t]here is no requirement that there be a threat of
physical harm to others for commitment under section 1026; and it should
not be engrafted onto section 1026.2." (*Ibid.*)

Turning to the merits, the trial court did not abuse its discretion in
finding that Diggs would be a danger to the health and safety of others if
released into CONREP. There was substantial evidence to support the
court's finding. As noted at the hearing, this case presented a "battle of the
experts" to the trial court. While Diggs' expert McCormick testified that

---

[3] Section 1026.5 sets forth the procedure for extending the commitment
of a person found NGI beyond his or her maximum term of commitment.

Diggs would not be a danger if released into CONREP, Souza, the prosecution's expert, disagreed and found that based on his assessment, Diggs "continues to be a danger to others as a result of his severe mental disorder." In support of this opinion, Souza explained that Diggs had yet to have adequate insight into the factors that drove his violence, had yet to accept his diagnosis of ASPD, and had yet to engage in substance abuse treatment despite testing positive for methamphetamine in 2019. On the other hand, McCormick believed that Diggs could adequately deal with his substance abuse despite the positive test and the incident with the Christmas cards. Simply put, the experts disagreed as to whether Diggs posed a danger if conditionally released.

The trial court did not by any means act capriciously or arbitrarily in finding that Diggs posed a danger based on Souza's testimony. (*People v. Henderson, supra*, 187 Cal.App.3d at p. 1268.) Souza is a senior forensic psychologist who received specialized training in risk assessment. He interviewed Diggs for approximately five hours and reviewed Diggs' treatment records from both Napa and Patton, police reports, and CONREP placement recommendations records. As part of the interview, Souza employed the HCR-20, the "gold standard" of violence risk assessment that has shown to be predictive across different populations. In addition, Avery, an assistant director at CONREP, testified that Diggs was not ready to be released into CONREP.

Given the above, the trial court reasonably concluded that Diggs was not ready to be released into the community based on the violent nature of his offense, his current diagnoses of ASPD and an amphetamine-use disorder, and lack of meaningful treatment to address his substance abuse disorder.

### 3. *Finding of Mental Defect, Disease, or Disorder*

Diggs next contends the trial court abused its discretion in finding that he suffered from a mental defect, disease, or disorder based on his diagnosis of ASPD.  We disagree.

We first note that in denying the petition, the trial court specifically stated that its decision was based on the combination of Diggs' ASPD *and* amphetamine use disorder.  Diggs does not argue that an amphetamine use disorder is not a mental defect, disease, or disorder for purposes of continued commitment under section 1026.2.

Diggs relies primarily on *Foucha v. Louisiana* (1992) 504 U.S. 71 (*Foucha*) to support his argument that ASPD does not constitute a "mental defect, disease, or disorder" under section 1026.2.  There, the high court held that a person committed based on NGI "may be held as long as he is both mentally ill and dangerous, but no longer." (*Id.*  at p. 77.)  The high court found that Foucha's continued commitment was improper where the testimony before the trial court showed that Foucha did not currently suffer from a mental disease or illness and the only argument for continued commitment was that his antisocial personality rendered him a danger to himself and others.[4]  (*Id.* at pp. 77–79.)

In *People v. Superior Court (Blakely)* (1997) 60 Cal.App.4th 202, the Second District clarified that "in *Foucha,* 'the State [did] not claim that Foucha [was] now mentally ill' [citation], only that he had an 'antisocial personality.' [Citation.]  Therefore, *Foucha* does not address whether a diagnosis of antisocial personality disorder may constitute a mental disorder

---

[4]  At the hearing in *Foucha*, one of the doctors appointed to conduct a pretrial examination testified that an antisocial personality is "a condition that is not a mental disease and that is untreatable." (*Foucha, supra*, 504 U.S. at p. 75.)

for purposes of an extended commitment." (*Id.* at p. 213.)  The court went on to hold that whether the defendant suffered from a mental disease, disorder or defect was "not a question of law, but rather one for the trier of fact to be resolved with the assistance of expert testimony." (*Ibid.*)

We agree with the above reasoning and do not interpret *Foucha* as holding that ASPD cannot as a matter of law be a mental disease, disorder, or defect for purposes of section 1026.2.  As Diggs himself notes in his briefing, mental health is fluid and diagnoses may change over time with a better understanding of the illness and the patient being treated.

Whether a defendant suffers from a mental illness is a question most appropriately left for medical experts to address and for the trier of fact to ultimately decide. In this case, experts on *both* sides diagnosed Diggs with ASPD and amphetamine use disorder.  Souza testified that Diggs' diagnosis of ASPD was manifested in his history of impulsivity, manipulative behavior, and lack of remorse or empathy.  McCormick testified that someone with ASPD may exhibit aggressive and manipulative behavior, lack of empathy, and disregard for rules.

This testimony supported the trial court's implicit finding that Diggs suffered from a mental defect, disease, or disorder that rendered him considered by the trial court in addition to Diggs' amphetamine-use disorder, to determine that Diggs posed a danger if released into CONREP.  Further, in any event, the trial court relied primarily on Diggs' amphetamine use disorder, with his ASPD taken into consideration, in denying his petition for release under section 1026.2.

### 4. *Due Process*

Diggs contends that his right to due process was violated because the trial court, in denying his petition, required that he engage in a substance

abuse treatment program that has been shut down due to the pandemic. We are not persuaded.

The People first argue that this claim is not ripe for review because Diggs was ordered to engage in future treatment before bringing another section 1026.2 petition, and that Diggs had not yet suffered any cognizable harm. We disagree. At the hearing, the trial court stated that it did not think that Diggs had "engaged in the meaningful treatment that is necessary for substance-use disorder to be ready for [release] at this time." Diggs then raised a concern that the treatment program has been shut down with no indication of reopening, and the court responded that it shared Diggs' frustration regarding the limitations caused by the pandemic and that it hoped conditions would improve so that he could participate in the program. Since one of the court's reasons in denying the subject petition was that Diggs had not engaged in intensive treatment (in the past), we find that his claim is ripe for review and turn to the merits.

First, we disagree with Diggs' contention that he has had no access to treatment through no fault of his own. In 2019, Diggs received treatment within the intensive substance recovery unit at Napa. After testing positive for methamphetamine, he refused to continue treatment or submit to any further drug testing. When Diggs was transferred to Patton, he interviewed to be admitted into its substance abuse recovery program but was not accepted. The reason is unknown, but Souza testified that this generally occurs when a patient is not deemed ready to engage in intensive treatment, such as where a patient tests positive but denies any drug use or drug problem.

Second, we do not find that Diggs' inability to participate in intensive substance abuse treatment due to COVID-19 constitutes a violation of his

due process.  The concept of due process is not absolute, and "the extent to which due process will be available depends on a careful and clearly articulated balancing of the interests at stake in each context.  (*People v. Ramirez* (1979) 25 Cal.3d 260, 269.)  The COVID-19 pandemic was an unprecedented global event that resulted in emergency orders and suspension of services across the country.  In balancing a criminal defendant's right to a fair and speedy trial with the health and safety of jurors and staff during this time, courts have held that the pandemic provided good cause for trial continuances.  (See *People v. Breceda* (2022) 76 Cal.App.5th 71, 92; *Stanley v. Superior Court of Contra Costa County* (2020) 50 Cal.App.5th 164, 169.)  Simply put, "[p]ublic health concerns trump the right to a speedy trial."  (*People v. Tucker* (2011) 196 Cal.App.4th 1313, 1314.)

Here, due to COVID restrictions, Patton had to limit various services it previously provided to patients due to limitations regarding the number of patients who could be in a certain area at any given time.  One such service that was suspended was the Recovery Lifestyle Program, an intensive substance abuse program Patton had offered.  Despite this, Patton still offered group substance recovery treatment at least once every two weeks that Diggs attended.  Given these limitations and the competing interest in maintaining the health and safety of both hospital staff and patients at Patton, we do not find that there has been a violation of Diggs' right to due process.

5. *Equal Protection*

Lastly, Diggs argues that it is a violation of equal protection to allow continued commitment of NGIs based on a diagnosis of ASPD when this diagnosis is insufficient to support the continued commitment of a similarly situated group, mentally disordered offenders (MDO).  Diggs initially frames the issue broadly as whether it is constitutional for continued commitments

for MDOs to be tied to the mental disorder underlying their initial commitments while continued commitments for NGIs are not. In his reply brief, Diggs narrows the issue and argues that "[t]he focus is not on all changes to a committed person's mental state but on resolution of the commitment disorder such that ASPD is the basis for continuing commitment." Our analysis accordingly, will focus on the issue of ASPD under these two commitment schemes.[5]

As both parties point out, the subject claim was not raised before the trial court. The People argue that this claim has been forfeited as a result. Although an equal protection claim may be forfeited if raised for the first time on appeal, we will exercise our discretion and consider the claim. (See *People v. Dunley* (2016) 247 Cal.App.4th 1438, 1447.)

## A. Similarly Situated

"The constitutional guaranty of equal protection of the laws means simply that persons similarly situated with respect to the purpose of the law must be similarly treated under the law. [Citations.] If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.] The question is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.'" (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155 (*Buffington*).)

Diggs argues that NGIs and MDOs are similarly situated for purposes of their continued commitment schemes. Diggs relies primarily on *People v. McKee* (2010) 47 Cal.4th 1172. There, our Supreme Court considered an

---

[5] Under the MDO scheme, a prerequisite to commitment and continued commitment is the finding of a "severe mental health disorder." (§§ 2962, subd. (a)(2); 2972, subd. (c).) Under section 2962, subdivision (a)(2), "severe mental health disorder" excludes a personality disorder.

equal protection challenge with respect to a law that allowed for indeterminate commitments of sexually violent predators (SVP). (*Id*. at p. 1196.) The court held that SVPs were similarly situated to MDOs in that both commitment schemes aimed to protect the public from dangerous offenders with mental disorders while providing treatment to them. (*Id*. at p. 1203.) The court went onto hold that SVPs and NGIs were similarly situated for these same reasons. (*Id*. at p. 1207.)

We acknowledge that the schemes underlying the initial commitments of NGIs and MDOs differ in several respects. For example, "[a]n [NGI] acquittee has raised his mental illness as a defense to his criminal conduct and there has been an adjudication that he committed a criminal act and was legally insane when he did so." (*People v. Wilder* (1995) 33 Cal.App.4th 90, 105.) By contrast, for a MDO, commitment can be ordered as a condition of a prisoner's parole if it is shown that the prisoner, among other requirements, has a severe mental disorder that caused or was an aggravating factor in the commission of the offense. (§ 2962, subd. (b).)

In terms of continuing their commitments, the burden of proof as well as the party who bears this burden differ for NGIs and MDOs. Under the NGI scheme, an applicant who seeks early release must prove by a preponderance of the evidence that he or she would not be "a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community." (§ 1026.2, subds. (e), (k).) Under the MDO scheme, the burden is on the prosecution to prove beyond a reasonable doubt that the offender has a severe mental disorder that causes him to be a substantial danger of physical harm to others in order to justify extended commitment. (§ 2972.)

Despite the differences, we find that NGIs and MDOs are similarly situated for purposes of the law in question because under both schemes, continued commitment is only warranted if the person has a current mental disorder that renders him or her a danger if released. These two groups need not share identical characteristics in order for us to find them similarly situated. (*People v. McKee, supra*, 47 Cal.4th at p. 1203.)

## B. *Similar Treatment*

If two groups are found to be similarly situated, the next question under equal protection analysis is whether they are similarly treated under the law. (*Buffington, supra*, 74 Cal.App.4th at p. 1155.) "A legislature may distinguish between persons or groups in passing legislation." (*Ibid.*) "Strict scrutiny is the correct standard of review in California for disparate involuntary civil commitment schemes because liberty is a fundamental interest." (*Id.* at p. 1156.) Under this standard, disparate treatment is upheld only if it furthers a compelling state interest. (*Ibid.*) "There is certainly a compelling state interest in identifying, confining, and treating persons who represent a danger to the health and safety of others. . . ." (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1231 (*Hubbart*).)

The question of whether equal protection requires that personality disorders be excluded from an involuntary commitment scheme by virtue of their exclusion under the MDO commitment scheme has been addressed by other courts. In *Buffington*, the Third Appellate District held that "[e]qual protection does not require that 'personality or adjustment disorders' be excluded from the SVP mental disorder standard simply because they are excluded from the MDO standard." (*Buffington, supra,* 75 Cal.App.4th at p. 1158.) The court found that SVPs and MDOs are similarly situated and similarly treated "because the triggering mental disorder is defined as a

current and recognized mental condition rendering those committed dangerous beyond their control." (*Ibid.*)

In *Hubbart,* the Sixth Appellate District similarly found no equal protection violation merely because personality disorders are excluded from the MDO scheme but not under the SVP scheme. (*Hubbart, supra,* 88 Cal.App.4th at p. 1218.) "[T]he terms used to describe the degree of mental disorder required for civil commitment carry no 'talismanic significance.' " (*Ibid.*, citing *Kansas v. Hendricks* (1997) 521 U.S. 346, 359.) Under both schemes, a committed person is required to have a mental disorder that renders the person a danger to others. "While phrased differently, the two schemes set forth similar standards for the mental disorder necessary for commitment. The two schemes do not treat the committed person differently for purposes of defining the requisite mental disorder." (*Hubbart, supra,* 88 Cal.App.4th at pp. 1218–1219.)

We agree with the above reasoning and do not find that there has been a violation of equal protection on the grounds that personality disorders like ASPD are excluded under the MDO scheme for continued commitment but not under the NGI scheme. Once committed, the two groups are treated similarly as their continued commitment is tied to a showing that they suffer from a current mental disorder that renders them a danger to others. (§§ 1026.2, subd. (e), 2972, subd. (c).)

## DISPOSITION

The trial court's order denying defendant's petition under section 1026.2 petition is affirmed.

NADLER, J.[*]

WE CONCUR:

POLLAK, P. J.
STREETER, J.

---

[*] Judge of the Sonoma County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court: Alameda County Superior Court

Trial Judge: Honorable Allan D. Hymer

Counsel for Defendant and Appellant: Julia Freis, under appointment of the Court of Appeal

Counsel for Plaintiff and Respondent: Rob Bonta, Attorney General of California
Lance E. Winters, Chief Assistant Attorney General
Charles C. Ragland, Senior Assistant Attorney General
Melissa Mandel, Supervising Deputy Attorney General
Teresa Torreblanca and Christen Somerville, Deputy Attorneys General